UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Fredrick Perkins and Alice J. Perkins,

Plaintiffs,

v.

United States of America,

Defendant.

**Report and Recommendation**

16-CV-495V

## I.    INTRODUCTION

Plaintiffs Fredrick Perkins ("Fredrick") and Alice Perkins ("Alice") live on the Allegany

Territory of the Seneca Nation of Indians ("Seneca Nation"), a member of the Haudenosaunee (or

Iroquois) Confederacy.  Alice has a possessory interest in some land on the Allegany Territory; part

of her interest comes by deed and part of it comes by lease.  Alice had obtained permission from

the Seneca Nation to mine gravel from her deeded or leased land in 2008 and 2009; she sold the

resulting gravel in those years and in 2010.  When plaintiffs filed their income-tax return for 2010,

they included $6,113 of income from gravel sales but listed it as tax-exempt.  The Internal Revenue

Service ("IRS") issued a tax deficiency in the amount of the gravel income plus interest and

penalties.

Plaintiffs paid off the deficiency to eliminate it but now have filed suit to obtain a refund

of what they paid.  Plaintiffs believe that their income from gravel sales in 2010 was exempt from

income tax under certain Indian treaties that protect Seneca Nation land and activities connected

directly to it.  Defendant the United States of America has filed a motion to dismiss plaintiffs'

amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP").  (Dkt.

No. 9.)  In short, defendant maintains that the Indian treaties in question either lack the language needed to create an exemption from income tax or contain language that applies only to real property taxes.

The Hon. Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b).  (Dkt. No. 10.)  The Court has deemed the pending motion submitted on papers under FRCP 78(b).  For the reasons below, the Court respectfully recommends granting the motion in part with respect to one of the treaties but denying the motion with respect to the other treaty.

## II.   BACKGROUND[1]

This case concerns allegations that defendant improperly assessed income tax for gravel that Alice mined from Seneca land in 2008 and 2009.  Alice is an enrolled member of the Seneca Nation and lives with Fredrick on the Seneca Nation Allegany Territory.  At an unspecified time, Alice obtained permission from the Seneca Nation to extract or to mine gravel from certain land on the Allegany Territory during the years 2008 and 2009.  Alice holds a restricted deed for some of the land in question and a lease for the remainder.  Alice mined gravel until about June 22, 2009 but had built up a stockpile that she continued to sell after that date.  Alice sold gravel until 2010.  The record does not state how much gravel Alice mined, to whom she sold it, or whether she sold it personally or through some kind of commercial entity.  The record also is not quite clear exactly what gross income or net income plaintiffs obtained through Alice's mining operations.  The parties do agree, though, that plaintiffs reported $6,113 of exempt income when

---

[1] For the sake of brevity, and consistent with the FRCP 12(b)(6) standard, the Court will refrain from repeated use of the words "alleged" or "allegedly" when describing the events that plaintiffs put in the amended complaint.  Nothing in this Background section constitutes a finding of fact unless otherwise noted.

they filed their 2010 tax return.  The exempt income came from Alice's mining operations.

Plaintiffs consider the income exempt because it derived directly from Seneca land protected by

certain treaties that the Court will discuss below.

      The exempt income reported on plaintiffs' 2010 tax return is the heart of plaintiffs' case

and defendant's pending motion.  The IRS issued plaintiffs a tax deficiency for 2010 in the

amount of $9,863.68.  (Dkt. No. 7 at 14.)  The deficiency comprised the income that plaintiffs

claimed as exempt plus interest and penalties.  Plaintiffs paid the tax to eliminate the deficiency

but then filed a claim for a refund.  (Dkt. No. 7 at 10–12.)  The IRS has not responded to

plaintiffs' claim for a refund.

      Plaintiffs began this case by filing their original complaint on June 16, 2016 (Dkt. No. 1)

and their amended complaint on September 9, 2016 (Dkt. No. 7).  Simply put, plaintiffs seek a

refund in the amount of $9,863.68, plus interest and costs.  Plaintiffs assert that two treaties

between the United States and the Seneca Nation make the income in question exempt.  Plaintiffs

have not numbered or labeled any distinct claims within the amended complaint, but the Court

will treat the alleged violation of each treaty as a separate claim or cause of action for a refund.

Plaintiffs claim exemption from income tax under the Treaty with the Six Nations of 1794 (the

"Canandaigua Treaty")[2] and the Treaty with the Seneca of 1842 (the "1842 Treaty").[3]  Plaintiffs

---

[2] Treaty Between the United States of America, and the Tribes of Indians called the Six Nations, Haudenosaunee-U.S., Nov. 11, 1794, 7 Stat. 44.  For the reader's convenience, a copy of the full text of the Canandaigua Treaty is attached to this Report and Recommendation as Appendix A.

[3] Treaty Made and concluded at Buffalo Creek, in the State of New York, on the twentieth day of May in the year one thousand eight hundred and forty-two, between the United States of America, acting herein by Ambrose Spencer their Commissioner, thereto duly authorized, on the one part, and the chiefs, headmen and warriors of the Seneca nation of Indians, duly assembled in council, on the other part, Seneca-U.S., May 20, 1842, 7 Stat. 586.  Again for the reader's convenience, a copy of the full text of the 1842 Treaty is

cite the following passage from the Canandaigua Treaty as support for their claim to a refund:

> Now, the United States acknowledge all the land within the aforementioned
> boundaries, to be the property of the Seneka Nation; and the United States will
> never claim the same, nor disturb the Seneka Nation, nor any of the Six Nations,
> or of their Indian friends residing thereon and united with them, in the free use
> and enjoyment thereof: but it shall remain theirs, until they choose to sell the same,
> to the people of the United States, who have the right to purchase.

7 Stat. 44, 45, Art. III.  According to plaintiffs, "[t]axation of land or income derived from the land

on the Seneca Nation territories would have been viewed as a burden placed on the Seneca people

disturbing their free use and enjoyment of such lands."  (Dkt. No. 7 at 3.)  Plaintiffs additionally

cite the following passage from the 1842 Treaty:

> The parties to this compact mutually agree to solicit the influence of the
> Government of the United States to protect such of the lands of the Senecas within
> the State of New York, as may from time to time remain in their possession from
> all taxes, and assessments for roads, highways, or any other purpose until such
> lands shall be sold and conveyed by the said Indians, and the possession thereof
> shall be relinquished by them.

7 Stat. 586, 590, Art. 9.  "This 1842 treaty is further evidence the United States never

contemplated the taxation of land for any purpose."  (Dkt. No. 7 at 3.)

Defendant filed the pending motion on September 14, 2016.  (Dkt. No. 9.)[4]  Defendant

argues that the Canandaigua Treaty contains no language specific enough to taxation to be

construed as a prohibition on income tax assessments.  The closest that the Canandaigua Treaty

comes to addressing taxation, according to defendant, is the phrase "free use and enjoyment."

---

attached to this Report and Recommendation as Appendix B.

[4] Defendant had filed an earlier version of its motion to address the original complaint.  (Dkt. No. 5.)  The
Court considers the current version of the motion to have superseded the earlier version, but it has not
terminated the earlier version in an abundance of caution about the limits of its referral from Judge
Vilardo.  As a housekeeping matter, the Court recommends denying the earlier version as moot or
otherwise terminating it.

Defendant argues that this phrase is too vague to be considered an exemption from income tax and would create a policy where none currently exists.  Defendant acknowledges that the 1842 Treaty makes an explicit reference to taxes but cites to case law interpreting the reference to refer only to property taxes.  Defendant also makes an argument that plaintiffs cannot find relief under criteria for exemptions that the IRS has established for Indian lands managed under an unrelated statute, the General Allotment Act, 24 Stat. 388 (1887) (codified as amended at 25 U.S.C. §§ 334, 339, 341, 342, 348, 349, 354).

Plaintiffs oppose the pending motion in all respects.  Plaintiffs assert that the "free use and enjoyment" phrase in the Canandaigua Treaty suffices to create an exemption from income tax for income derived directly from the land preserved by the treaty for the Seneca Nation.  Plaintiffs argue that the 1842 Treaty and its protection "from all taxes" provide a second and much more explicit legal basis for an exemption from income tax.  Even if some ambiguity exists about how to apply the two treaties to the scenario of a modern income tax, plaintiffs argue that the treaties are explicit enough about the principal of exemption from taxation to prompt rules of treaty construction that would resolve any ambiguities in their favor.  To the extent that defendant makes any arguments under the General Allotment Act, plaintiffs note that the statute does not apply to the Seneca Nation.

## III.   DISCUSSION

### A.  Motions to Dismiss Generally

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a

probability requirement, but it asks for more than a sheer possibility that a defendant has acted

unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability,

it stops short of the line between possibility and plausibility of entitlement to relief."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  Courts assess

Rule 12(b)(6) motions "accepting all factual allegations in the complaint as true, and drawing all

reasonable inferences in the plaintiff's favor."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,

602 F.3d 57, 61 (2d Cir. 2010) (internal quotation marks and citation omitted).  "On a motion to

dismiss, the court may consider any written instrument attached to the complaint as an exhibit or

any statements or documents incorporated in it by reference."  *Yak v. Bank Brussels Lambert*, 252

F.3d 127, 130 (2d Cir. 2001) (editorial and internal quotation marks and citation omitted).

"Simply stated, the question under Rule 12(b)(6) is whether the facts supporting the claims, if

established, create legally cognizable theories of recovery."  *Cole-Hoover v. Shinseki*, No. 10-CV-669,

2011 WL 1793256, at *3 (W.D.N.Y. May 9, 2011) (internal quotation marks and citation

omitted).

### B.  *Taxation and Indian Treaties Generally*

Next, the Court needs to review some general principles that govern taxation and the

interpretation of Indian treaties.  Both the Sixteenth Amendment and the Internal Revenue Code

start with the premise that all individuals, including Indians, are subject to the income tax unless

an exemption applies.  *See* 26 U.S.C. §§ 1, 61; *Squire v. Capoeman*, 351 U.S. 1, 6 (1956) ("We agree

with the Government that Indians are citizens and that in ordinary affairs of life, not governed by

6

treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens.  We also agree that, to be valid, exemptions to tax laws should be clearly expressed.").  Indian law provides two general methods to obtain an income-tax exemption.  One method applies to lands governed by the General Allotment Act and requires satisfying certain IRS criteria pertaining to the ownership status of the land, the connection between the income in question and the land itself, and congressional intent about taxation.  *See generally* Rev. Rul. 67-284, 1967-2 C.B. 55 (1967).  Per statutory provision, however, the General Allotment Act does not apply to the Seneca Nation.  25 U.S.C. § 339.  The Court consequently will not further address the first method of income-tax exemption or any cases decided under the General Allotment Act, unless those cases contain principles that apply more broadly.

   To avoid dismissal, then, plaintiffs need to have a cognizable claim that plausibly could avail them of the second method of income-tax exemption.  The second method requires language in a treaty that evinces some intent to exempt Indians from taxes like the income tax.  *See, e.g.,* *Choteau v. Burnet*, 283 U.S. 691, 697 (1931) ("The intent to exclude must be definitely expressed, where, as here, the general language of the act laying the tax is broad enough to include the subject-matter.") (citation omitted).  The Court is not aware of any Indian treaty that would ever provide a clear exemption explicitly for the income tax; the Sixteenth Amendment was ratified in 1913, and all Indian treaties in force today predate it.  *See* 25 U.S.C. § 71 ("No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to

7

March 3, 1871, shall be hereby invalidated or impaired.").  Explicit references to the income tax

are not necessary, however.  *See Capoeman*, 351 U.S. 1, 7 (1956) ("The fact that [an amendment to

the General Allotment Act] antedated the federal income tax by 10 years also seems irrelevant.").

A treaty need only contain language that sufficiently demonstrates an intent by the United States

government to exempt an Indian tribe from any sort of tax, fee, or other encumbrance that is

similar or analogous to whatever tax new litigants seek to avoid.  The Ninth Circuit has provided a

concise summary of the standard that plaintiffs have to satisfy:

> The applicability of a federal tax to Indians depends on whether express exemptive
> language exists within the text of the statute or treaty.  The language need not
> explicitly state that Indians are exempt from the specific tax at issue; it must only
> provide evidence of the federal government's intent to exempt Indians from
> taxation.  Treaty language such as "free from incumbrance," "free from taxation,"
> and "free from fees," are but some examples of express exemptive language required
> to find Indians exempt from federal tax.  Only if express exemptive language is
> found in the text of the statute or treaty should the court determine if the
> exemption applies to the tax at issue.

*Ramsey v. United States*, 302 F.3d 1074, 1078–79 (9th Cir. 2002); *see also Holt v. C.I.R.*, 364 F.2d 38,

40 (8th Cir. 1966) ("Courts have recognized that treaties and statute[s] relating to the right of

noncompetent Indians should be liberally construed in favor of Indians.  However, such principle

comes into play only if such statute or treaty contains language which can reasonably be construed

to confer income exemptions.") (citations omitted).

As long as any treaty in question contains the minimum necessary language, any

ambiguities in the details are resolved in favor of the Indian individual or tribe.  *See, e.g., Minnesota

v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999) ("We have held that Indian

treaties are to be interpreted liberally in favor of the Indians, and that any ambiguities are to be

resolved in their favor.") (citations omitted); *Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 247 (1985) ("The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians.  Thus, it is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.  Absent explicit statutory language, this Court accordingly has refused to find that Congress has abrogated Indian treaty rights.") (internal quotation marks and citations omitted).  That said, though, "even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943) (citations omitted).

### C.  Application to Plaintiffs

With the above taxation and construction principles in mind, the Court now turns to each of the treaties that plaintiffs have cited as a basis for the income-tax exemption that they claimed.

#### i.   Canandaigua Treaty

The Canandaigua Treaty, as noted previously, states that the United States government would not disturb the Seneca Nation or any individual Senecas in the "free use and enjoyment" of the land defined by that treaty.  The treaty contains no other language that refers to taxes, fees, or similar burdens more directly.  Any income-tax exemption thus would have to come from the phrase "free use and enjoyment" by itself.  In support of their arguments, plaintiffs offer legal authorities that suggest similar conclusions indirectly.  For example, plaintiffs have cited to *Hoptowit v. Commissioner*, 709 F.2d 564, 566 (9th Cir. 1983).  The holding of *Hoptowit* was that the phrase "exclusive use and benefit," as set forth in the Treaty with the Yakimas of 1855, did not

create an income-tax exemption for per-diem payments that the plaintiff received for his work as a

Tribal Council Member.  Strictly speaking, the holding of *Hoptowit* is of no use here, but the

Ninth Circuit did note parenthetically that "[i]f the Treaty gives rise to a tax exemption, the

Commissioner argues, it is limited to income produced directly by reservation land."  *Hoptowit*,

709 F.2d at 566.  The farthest in plaintiffs' direction that the Ninth Circuit went was to note that

"[t]he Treaty language on which Hoptowit bases his claim gives to the Tribe the exclusive use and

benefit of *the land* on which the reservation is located.  Thus, as in [*Commissioner v. Walker*, 326

F.2d 261 (9th Cir. 1964)], any tax exemption created by this language is limited to the income

derived directly from the land.  It does not extend to the use of that income to compensate

Hoptowit for his service as a Tribal Council Member."  *Id.; see also King Mountain Tobacco Co. v.*

*Alcohol & Tobacco Tax & Trade Bureau*, 923 F. Supp. 2d 1280, 1287 (E.D. Wash. 2013) ("King

Mountain is not exempt from federal excise tax on tobacco products under the General Allotment

Act and [*Squire v. Capoeman*, 351 U.S. 1 (1956)] because the excise tax does not tax products

directly derived from the land.  Any exception to taxation that could be inferred in Article II of the

Treaty [with the Yakimas of 1855] is similarly limited to products derived directly from the land.")

(citing *Hoptowit*).  The language is useful, from plaintiffs' perspective, although it is not a holding.

Similar useful language comes from another case that plaintiffs cited, a case that cited *Hoptowit*:

*Lazore v. Commissioner*, 11 F.3d 1180 (3d Cir. 1993).  The holding of *Lazore* was that plaintiffs,

married residents of the St. Regis Mohawk Indian Reservation, could not use the Canandaigua

Treaty categorically to exempt income earned from jobs with the Reynolds Metals Company and

the Mohawk Indian Housing Corporation.  As with *Hoptowit*, the holding of *Lazore* does not help

the Court with its case at all.  Nonetheless, *Lazore* contains the speculation that "[t]he language relied on by the Lazores [*i.e.*, the "free use and enjoyment" phrase from the Canandaigua Treaty] might be sufficient to support an exemption from a tax on income derived directly from the land." *Lazore*, 11 F.3d at 1187 (citing *Hoptowit*).  The Tax Court also has made parenthetical speculations in different scenarios that could be seen as helpful to plaintiffs' scenario.  *In Sylvester v. Commissioner*, 77 T.C.M. (CCH) 1346, 1999 WL 4977377  (T.C. 1999), the holding was that an employee of Schindler Elevator Corporation and, later, Dover Elevator Company—two corporations that apparently had nothing whatsoever to do with the Seneca Nation—was not entitled to an income-tax exemption under the Canandaigua Treaty simply because he was a Seneca.  Yet just before the formal holding, the Tax Court chose to make a finding "that none of petitioner's income was derived directly or indirectly from the use of Indian land, or from services performed on Indian land, or related in any way to petitioner's status as a member of the Seneca Nation."  *Sylvester*, 1999 WL 4977377, at *2.  The Tax Court's finding implies that the inverse of any of the parts of that finding would have given the petitioner an exemption.  The Court has had trouble finding cases that addressed a situation like plaintiffs' more directly; for example, cases that cited *Hoptowit* concerned fairly obvious commercial activities not connected directly to any land. *See, e.g., Dillon v. United States*, 792 F.2d 849, 853 (9th Cir. 1986) ("The [Medicine Creek] Treaty is not violated here by the imposition of a federal tax on smokeshop income."); *Cook v. United States*, 32 Fed. Cl. 170, 175 (1994) ("We hold that the Fort Stanwix Treaty, the Fort Harmar Treaty, and the Treaty of Canandaigua cannot reasonably be construed to provide plaintiffs an exemption from their obligation to pay federal excise taxes on the import, storage, and sale of diesel fuel.");

*but see id.* at 174 ("The treaty provision applies to the use of land.  The excise statute in question taxes a particular activity, not the land itself or the plaintiffs' use of the land.").

Where do these authorities leave plaintiffs?  The above authorities couple strong holdings against inapplicable scenarios with consistent suggestions that plaintiffs' scenario would have required an income-tax exemption.  The Court is not aware of any authority that denies an exemption for activity, like the plaintiffs' activity, that had at least a colorable connection directly to land protected by the phrase "free use and enjoyment" or similar treaty language.  Given that plaintiffs right now need only plead a cognizable claim, and given the benefit of the doubt accorded to Indian tribes when interpreting treaties, the best course of action at this time is to recognize plaintiffs' claim under the Canandaigua Treaty as the potential scenario that eluded all of the above authorities, subject to confirmation during discovery.  The Court currently knows nothing about why Alice wanted to extract gravel, why the Seneca Nation gave her permission to do so, how Alice sold the gravel, or how much she sold.  Did Alice sell the gravel in front of her house the way some people cut their own timber from their backyards and sell firewood on the shoulder of the road in front of their houses?  Did Alice sell gravel through a commercial entity that did other things much less connected to Seneca land?  Some of these details might matter; some might not.  Potentially, though, plaintiffs will be able to present a scenario in which a fairly modest amount of income came so directly from Seneca land that, in a sense, they were selling a part of the physical land itself.  *Cf. Capoeman*, 351 U.S. at 10 (Case under the General Allotment Act in which "Respondent's timber constitutes the major value of his allotted land.  The Government determines the conditions under which the cutting is made.  Once logged off, the

12

land is of little value.").  The authorities that the Court cited above consistently have suggested

that, presented with plaintiffs' scenario, they would have found that treaty language such as "free

use and enjoyment" exempted plaintiffs' scenario from income tax.[5]  These consistent suggestions

mesh with the Court's own sense that plaintiffs' scenario potentially fills in the case law with a rare

demonstration of how a direct connection to Indian land actually would look.  For purposes of

Rule 12(b)(6), plaintiffs have shown enough to let their claim under the Canandaigua Treaty

survive into discovery.

      For the above reasons, the Court concludes that plaintiffs plausibly have stated a

cognizable claim for a refund under the Canandaigua Treaty.  The Court thus recommends

denying defendant's motion with respect to the Canandaigua Treaty.

      *ii.*    *1842 Treaty*

      Ironically, though the 1842 Treaty contains much more explicit language about taxes,

plaintiffs run into trouble on this argument for a different reason.  In *United States v. Kaid*, 241 F.

App'x 747 (2d Cir. 2007), five defendants appealed from their convictions and sentences for

conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and trafficking in

contraband cigarettes, in violation of 18 U.S.C. § 2342.  The defendants apparently did not claim

to be enrolled members of the Seneca Nation but sold "massive quantities of cigarettes" on Seneca

land.  241 F. App'x at 750.  Among nine issues raised on appeal, the defendants argued that taxing

---

[5] Incidentally, one case that defendant cited in its motion papers does not contradict these other authorities.  In *Seneca Nation of Indians v. New York*, 206 F. Supp. 2d 448, 487 (W.D.N.Y. 2002), the court did describe the purposes of the Canandaigua Treaty in terms that omitted any mention of taxes or tax exemptions.  That case, however, addressed a geographical dispute so different from the dispute here that its description of the Canandaigua Treaty's overall purposes did not necessarily preclude the application of the treaty's language to tax disputes.

cigarettes sold on Seneca land to non-Indians violated the 1842 Treaty.  The Second Circuit

dispatched the argument in two sentences.  "Appellants' claims that taxing cigarette sales made on

reservations to non-Native Americans violates the Treaty with the Seneca, May 20, 1842, 7 Stat.

586, 590 (1842), or New York Indian Law § 6 (McKinney 2000), are equally unavailing.  Both the

treaty and the New York statute clearly prohibit only the taxation of real property, not chattels like

cigarettes."  *Id.* (citing *Snyder v. Wetzler*, 603 N.Y.S.2d 910, 912–13 (App. Div. 1993).  *Snyder*, in

turn, contains the holding that "States may validly impose a nondiscriminatory tax on the non-

Indian customers of Indian retailers doing business on reservations, however, even if the tax

seriously disadvantages or eliminates the Indian retailer's business with non-Indians."  603

N.Y.S.2d at 915 (internal quotation marks and citations omitted).  To reach that holding and to

apply it to a business selling cigarettes and motor fuel, the Appellate Division in *Snyder* made the

finding that the 1842 Treaty "clearly refers only to taxes levied upon real property or land."  *Id.* at

912.  Nonetheless, just before the holding, the Appellate Division chose to emphasize that "this is

not a case about land taxes, personal property taxes, or income taxes, nor has any Indian been

subjected to taxation."  *Id.* at 915.  A subsequent Appellate Division case that cited *Snyder* added

the limited clarification that the 1842 Treaty "prohibits the State from taxing reservation land

[but] does not bar the imposition of excise and sales taxes on cigarettes and motor fuel sold to non-

Indians on the Seneca Nation's reservations."  *N.Y. State Dep't of Taxation & Fin. v. Bramhall*, 667

N.Y.S.2d 141, 147–48 (App. Div. 1997) (citing *Snyder*).  Left unaddressed is what the Appellate

Division might have done in a case that was about income taxes, or more specifically taxes on

income that possibly could be considered equivalent to taxing reservation land.

14

While plaintiffs did not address *Kaid* in their motion papers, some of their other arguments could be construed as arguments to distinguish or even to modify the part of *Kaid* that addressed the 1842 Treaty.  And there are arguments that could be made about *Kaid*.  *Kaid* does not appear to have featured enrolled members of the Seneca Nation.  *Kaid* had nothing to do with income earned from direct use of land protected by the 1842 Treaty or any other treaty.  In briefly addressing one argument out of nine presented, the Second Circuit might not have intended to reach beyond cigarette sales to address plaintiffs' scenario or similar scenarios.  Whatever the merits of these arguments or others, however, they are arguments to be made to the Second Circuit.  For this Court's purposes, *Kaid* says what it says.  The Second Circuit could have stopped at saying that the 1842 Treaty does affect "chattels like cigarettes," leaving for future cases whether it prohibited taxes on various sources of income.  Even a different grammatical layout in *Kaid* might have helped plaintiffs.  The word "only" is a modifier that usually limits the word or phrase closest to it.  *See United States v. Lockhart*, 749 F.3d 148, 152 (2d Cir. 2014) ("Under the last antecedent rule, a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows.") (internal quotation marks and citations omitted).  If the Second Circuit had written that the 1842 Treaty prohibited "the taxation of *only real* property" then there would be a better argument that the Second Circuit distinguished real property from chattels without addressing income taxes.  The Second Circuit instead made the whole phrase "taxation of real property" the target of the modifier "only," thereby limiting the 1842 Treaty to one specific category of taxation.  Plaintiffs' claims and arguments here cannot survive against such a sharp limitation.

15

For the above reasons, the Court recommends granting defendant's motion with respect to the 1842 Treaty.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting defendant's motion (Dkt. No. 9) in part to dismiss plaintiffs' claim for a refund under the 1842 Treaty.  The Court recommends denying the motion with respect to plaintiffs' claim for refund under the Canandaigua Treaty.

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

___/s Hugh B. Scott_____
Honorable Hugh B. Scott
United States Magistrate Judge

DATED: January 27, 2017

16