UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FREDRICK PERKINS and ALICE J.
PERKINS,

                              Plaintiffs,          Civ. No. 1:16-cv-00495-LJV/HBS

              -vs-                                 Hon. Lawrence J. Vilardo
                                                      District Court Judge

UNITED STATES OF AMERICA,

                              Defendant.

## PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE
## HUGH B. SCOTT'S REPORT AND RECOMMENDATION

**MARGARET A. MURPHY, P.C.**
Margaret A. Murphy, of counsel
6506 East Quaker Street, Suite 200
Orchard Park, New York 14127
Telephone No.: (716) 662-4186

**GARY D. BOREK, LLC**
Gary D. Borek, of counsel
99 Victoria Blvd.
Cheektowaga, NY 14225-4321
Telephone No.: (716) 839-4321

*Attorneys for Plaintiffs*
*Fredrick Perkins and Alice J. Perkins*

## PRELIMINARY STATEMENT

On September 6, 2016, Plaintiffs Fredrick Perkins and Alice J. Perkins
("Alice") (collectively with Fredrick Perkins, the "Perkins" or "Plaintiffs") filed an
amended complaint against Defendant United States of America (the
"Government") seeking a refund of income tax, interest, and penalties unlawfully
and erroneously collected by the Government.   (Dkt. No. 7).   In their amended
complaint, the Perkins alleged income earned by Alice from the sale of gravel
extracted from the Seneca Nation of Indians Allegany Territory is exempt from
federal income tax due to explicit language contained in specific federal treaties.
(*Id.*).   On September 14, 2016, the Government filed a notice of motion to dismiss
pursuant to Rule 12(b)(6) of the Federal Rule of Civil Procedure. (Dkt. No. 9).  By a
Referral Order issued on September 16, 2016 pursuant to 28 U.S.C. § 636(b), this
Court assigned Magistrate Judge Hugh B. Scott ("Scott") to hear and report on this
and any other dispositive motions.  (Dkt. No. 11).

On January 27, 2017, Scott issued his report and recommendation.  (Dkt. No.
14).  Scott recommended, "granting the motion in part with respect to one of the
treaties but denying the motion with respect to the other treaty."   (*Id.* at 2).
Although Scott concluded the Perkins "plausibly have stated a cognizable claim for
refund" based on the "free use and enjoyment" provision contained in the
Canandaigua Treaty of 1794 ("the Canandaigua Treaty"), November 11, 1794, 7
Stat. 44, 45, art. III, (Dkt. No. 14 at 13), he recommended the dismissal of Perkins'
alternative claim based on the "much more explicit language about taxes" contained

1

in the Treaty with the Seneca, May 20, 1982 (the "1842 Treaty"), 7 Stat. 586, 590, art. 9. (Dkt. 14 at 13-16). Pursuant to Rule 72 (b) of the Federal Rule of Civil Procedure and Local Rule 72, the Perkins object to the report and recommendation as it relates to the dismissal of their 1842 Treaty claim.[1]

## OBJECTIONS IN POINT OF LAW

### I

**THIS COURT IS NOT PRECLUDED FROM RULING ON AN ISSUE OF FIRST IMPRESSION RELATING TO WHETHER INCOME DERIVED FROM RESTRICTED LANDS LOCATED WITHIN THE SENECA NATION TERRITORY IS EXEMPT FROM FEDERAL INCOME TAX BASED ON SPECIFIC LANGUGE CONTAINED WITHIN THE 1842 TREATY**

Treaties with the Seneca Nation of Indians contain "language which can reasonably be construed to confer [an] income [tax] exemption." *Holt v. Commissioner*, 364 F.2d 38, 40 (8th Cir. 1966)(before panel including Justice Blackmun) *cert. denied,* 386 U.S. 931 (1967). The Government promised in these treaties not to disturb the Seneca Nation or "their Indian friends residing" on its territory and "united with them, in the free use and enjoyment" of lands within the Seneca Nation territories and to protect such lands from all taxes for whatever purpose. Canandaigua Treaty, 7 Stat. at 45, art. III; 1842 Treaty, 7 Stat. at 590, art. 9. Congress has taken no action to abrogate these treaties. Nonetheless, contrary to the provisions of § 894(a)(1) of the Internal Revenue Code, the

---

[1] The report and recommendation states the Perkins earned "$6,113 of income from gravel sales" in 2010. (Dkt. No. 14 at 1, 2). In their amended complaint, the Perkins stated the IRS claimed they owed additional income tax in the amount of $6,113.00 for income earned from the gravel sales in 2010. (Dkt. No. 7 ¶¶6, 7, 8. 29). This minor error in the report and recommendation is not material to the Court's determination. The Perkins otherwise agree with Scott's statement of the material facts relevant to the pending dismissal motion. (*See* Dkt. No. 14 at 1-5).

Government has failed to give "due regard" to its treaty obligation to a taxpayer who is member of the Seneca Nation whose income is derived directly from the aboriginal lands of the Seneca Nation.

### A. The Court Is Required to Liberally Construe the 1842 Treaty to Determine Whether Income Derived from Land on the Seneca Nation Territory is Exempt from Federal Income Tax.

"[I]n ordinary affairs of life, *not governed by treaties* or remedial legislation, [Indians] are subject to the payment of [federal] income taxes as are other citizens." *Squire v. Capoeman*, 351 U.S. 1, 6 (1956); *see, also, Hoptowit v. Commissioner of Internal Revenue*, 709 F.2d 564, 565 (9th Cir. 1983). With regard to federal income tax, however, "Congress has passed neither a statute specifically abrogating the provisions of Indian treaties nor a statute of general application that has the effect of abrogating Indian treaties." *Lazore v. Commissioner of Internal Revenue*, 11 F.3d 1180, 1183 (3d. Cir. 1993). Even though the Internal Revenue Code § 61(a) defines "gross income" to mean "all income from whatever source derived," the Code provisions are to be applied to a taxpayer "with due regard to any treaty obligation of the United States which applied to such taxpayer." IRC § 894(a)(1). A Native American taxpayer, therefore, is entitled to an exemption if it can be shown that specific language within a statute or a treaty ratified by Congress evinces a congressional intent to exempt certain income from federal income tax. *See, e.g., Squire,* 351 U.S. at 6 (finding income exempt from federal income tax based on a federal statute, the General Allotment Act of 1887); *Hoptowit*, 709 F.2d at 566 (finding the "exclusive use and benefit" provision within a treaty provided a limited

tax exemption for "income derived directly from the land," but not for income earned while working on the reservation). *See, also,* Rev. Rul. 67-284, 1967-2 C.B. 55 ("exemption of Indians from the payment of tax must derive plainly from treaties or agreement with the Indian tribes concerned, or some act of Congress dealing with their affairs").

A cardinal rule in the interpretation of federal statutes or treaties dealing with Indians is that ambiguities are to be resolved in favor of the Indians. *See, e.g., County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation,* 502 U.S. 251, 269 (1992) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.") *quoting Montana v. Blackfeet Tribe,* 471 U.S.759, 766 (1985); *McClanahan,* 411 U.S. at 174 ("[I]n interpreting Indian treaties, . . . the general rule [is] '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'") *quoting Carpenter v. Shaw,* 280 U.S. 363, 367 (1930).

The rule that ambiguous statutes and treaties are to be construed in favor of Indians applies to tax exemptions. *Choate v. Trapp,* 224 U.S. 665, 675 (1912); *see, e.g., Squire,* 351 U.S. at 6-7 (construing the General Allotment Act of 1887 to create exemption for not-yet-created federal income tax); *Hoptowit,* 709 F.2d at 566 (construing the 1855 Treaty with the Yakima as creating a limited tax exemption for income derived directly from the land). This specific rule of construction deviates from the general rule that congressional intent must be shown by clear and

4

unambiguous language to exempt income from taxation.   In *Trapp,* the United

States Supreme Court held  the general rule is inapplicable to Native Americans:

> But in the government's dealings with the Indians the rule is exactly
> the contrary. The construction, instead of being strict, is liberal;
> doubtful expressions, instead of being resolved in favor of the United
> States, are to be resolved in favor of a weak and defenseless people,
> who are wards of the nation, and dependent wholly upon its protection
> and good faith. This rule of construction has been recognized, without
> exception, for more than a hundred years, and has been applied in tax
> cases.

224 U.S. at 674-675.  The more liberal rule of construction, therefore, has made it

possible for a court to find language within a treaty or special statute to create a

federal income tax exemption even though the ratification of the treaty or the

enactment of special statute took place long before the enactment of any federal

statute imposing a federal income tax.  *See, e.g., Squire*, 351 U.S. at 6-7; *Hoptowit*,

709 F.2d at 56.

As the United States Supreme Court has repeatedly held, treaties must "be

construed, not according to the technical meaning of its words to learned lawyers,

but in the sense in which they would naturally be understood by the Indians."

*Jones  v.  Meehan*,  175  U.S.  1,  11  (1899);  *Washington  v.  Washington  State

Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 676 (1979); *Choctaw

Nation v. Oklahoma,* 397 U.S. 620, 631 (1970) ("treaties with the Indians must be

interpreted as they would have understood them, and any doubtful expressions in

them should be resolved in the Indians' favor").  This Court is bound by the doctrine

of *stare decisis* to follow these liberal rules of constructions when deciding whether

treaties with the Seneca Nation can reasonably be construed to confer a federal income tax exemption.

In the 1842 Treaty, the United States promised:

> to protect such of the lands of the Seneca Indians, within the State of New York, as may from time to time remain in their possession *from all taxes,* and assessment for roads, highways, or *any other purpose*, until such lands shall be sold and conveyed by the said Indians and the possession thereof shall have been relinquished by them. (Emphasis added).

1842 Treaty, May 20, 1842, 7 Stat. 586, 590, art. 9.  The words are explicit.  The United States promised to protect these lands "from all taxes" for whatever purpose. No other treaty with any Indian nation sets forth a clearer or less ambiguous tax exemption for income derived from the use of tribal land.

The 1842 Treaty reaffirms the promises made by the Government in the Canandaigua Treaty.  In the Canandaigua Treaty, the Government promised not to disturb the Seneca Nation or "their Indian friends residing" on its territory and "in the free use and enjoyment" of lands within its treaty-defined territory. Canandaigua Treaty, November 11, 1794, 7 Stat. 44, 45, art. III.  After the State of New York sought to tax and foreclose upon these lands, the Government stepped in to assure the Seneca Nation that no one would interfere with "the free use and enjoyment" of its aboriginal lands and promised "to protect such of the lands of the Seneca Indians . . . *from all taxes*" for whatever purpose such tax might be imposed.  1842 Treaty, May 20, 1842, 7 Stat. 586, 590, art. 9.   The 1842 Treaty and the Canandaigua Treaty, therefore, should be interpreted *in pari materia.*

6

**B. The Court May Look to Dicta When Deciding an Issue of First Impression as to Whether Specific Language within a Treaty Can Reasonable Be Construed to Confer a Tax Exemption.**

While the Court is directed by the principle of *stare decisis* to construe liberally any ambiguous provisions within a treaty in favor of the Indians, there is no cases or decisions in which a federal court or the Tax Court have been asked to determine whether language within either the Canandaigua Treaty or the 1842 Treaty confer an income tax exemption for income derived from farming, harvesting, mining or working these treaty-protected lands. In his report and recommendation, Scott wrote, "The Court is not aware of any authority that denies an exemption for activity, like the plaintiffs' activity, that had at least a colorable connection direct to land protected by the phrase 'free use and enjoyment' or similar treaty language." (Dkt. No. 14 at 12).  Recognizing this case as presenting issues of first impression, Scott properly relied upon dicta that consistently suggest the factual scenario presented in this case would support a federal tax exemption claim. (*Id.*).

In *Hoptowit*, for example, an Indian taxpayer sought an exemption based on the Treaty with the Yakimas of 1855.  709 F.2d at 565.  The treaty set aside certain tracts of land "for the exclusive use and benefit of said confederated tribes and bands of Indians."  *Id.* at 566.   The Commissioner conceded the treaty gave a limited exemption for "income produced directly [from] reservation land."  *Id.*  The United States Court of Appeals for the Ninth Circuit agreed, but held the "exclusive use and benefit" language did not create a blanket exemption for all income earned

7

on the reservation, only a limited exemption from "income derived directly from the land." *Id.*

In *Lazore,* the United States Court of Appeals for the Third Circuit examined the "free use and enjoyment" provision of the Canandaigua Treaty. 11 F.3d at 1187. In that case, enrolled members of the St. Regis Mohawk Tribe asserted their income was exempt from federal taxation. *Id.* Citing to the Ninth Circuit's decision in *Hoptowit,* the Third Circuit held the "free use and enjoyment" provision "might be sufficient to support an exemption from a tax on income derived directly from the land," but was insufficient to create blanket exemption for all income earned on and off the reservation. *Id. See, also, Sylvester v. Commissioner of Internal Revenue*, Docket No. 10777-97, T.C. Memo 1999-35 at *6-7 (finding petitioner not exempt based on his status as a member of the Seneca Nation, but suggesting "income derived directly or indirectly from the use of Indian land" might be exempt); 35 Ops. Att'y Gen 107,108-09, 1926 WL 2180 at *1 (1925).

In *Cook v. United States*, 86 F.3d 1095 (Fed. Cir. 1996), owners of a diesel fuel truck stop within the Onondaga Indian Territory sought a refund on federal excise tax on the sale of diesel fuel. The Circuit found the Canandaigua Treaty granting the Onondaga Indians the "free use and enjoyment" of their land and securing their "peaceful possession" of those lands. *Id.* at 1097. However, it held these provisions "appl[y] to the use of land," and not to "the sale of a commodity." The Court further found that an excise tax on fuel is not a tax on income derived directly from the land. *Id.* at 1098. Citing to *Squire,* the court defined "income

8

derived from the land" as "income from activities that exploit the land, such as the sale of timber from the Indian land." *Id.* Gravel mined from tribal land would fall within this definition. *Accord* Rev. Rul. 70-116, 1970-1 C.B. 11, 1970 WL 20654 (exempting income from mineral rights); Rev. Rul. 67-284, 1967-2 C.B., 1967 WL 14945 at *2 (providing list of income derived directly from the land, including "proceeds from the sale of the natural resources of the land.").

In the words of former Attorney General John G. Sargent, "Indians have always been the subject of special legislation, and that general legislation, and especially revenue laws, which burden and restrict the use and enjoyment of property, should not be applied to Indian wards unless Congress clearly so directs." 35 Ops. Att'y Gen 107,108-09, 1926 WL 2180 at *1 (1925). In enacting the Internal Revenue Code, not only did Congress never express any intent to abrogate any federal treaties with the Senecas, but it explicitly recognized Code provisions should be applied to a taxpayer "with due regard to any treaty obligation of the United States which applied to such taxpayer." IRC § 894(a)(1).

Three circuit courts, former IRS Commissioners and a former United States Attorney General have all suggested the "free use and enjoyment" language within the Canandaigua Treaty could reasonably be construed to confer a federal tax exemption for income derived from farming, harvesting, mining or working treaty-protected lands. If the phrase "free use and enjoyment" can be construed to confer such an exemption, then the Government's promises to protect these lands "from all taxes" for whatever purpose should be accorded the same interpretation. The dicta

9

contained within these legal authorities is sufficient, as a matter of law, to permit this Court to rule that the language contained in the 1842 Treaty and the Canandaigua Treaty can reasonably be construed to confer a federal tax exemption for income earned from sale of gravel mined on the Seneca Nation territory.

### C. The Court Should Give No Precedential Effect to Rulings by a State Appellate Court or a Summary Order Issued by the Second Circuit.

In his report and recommendation, Scott found it ironic that "though the 1842 Treaty contains much more explicit language about taxes, plaintiffs run into trouble on this argument for a different reason." (Dkt. 14 at 13).   He found a summary order issued by the United States District Court for the Second Circuit in *United States v. Kaid*, 241 F. App'x 747 (2d Cir. 2007) and two decisions issued by the State of New York Supreme Court Appellate Division precluded any findings that the language within the 1842 Treaty supported a claim for federal income tax exemption. *See Snyder v. Wetzel*, 193 A.D.2d 329 (3d Dep't 1993), *aff'd* 84 N.Y.2d 941 (1994) and *New York State Dep't of Taxation and Finance v. Bramhall*, 235 A.D.2d 75 (4th Dep't 1997).  (*Id.* at 13-15).

In *Kaid, Snyder*, and *Bramhall,* the courts were asked to decide whether the 1842 Treaty prohibits the State of New York from taxing cigarettes and motor fuel sold on Indian reservations to non-tribal members.  None of these courts were asked as to decide whether the 1842 Treaty prohibited the taxation of income derived directly from tribal lands.   Imposing sale and excise taxes on a commodity manufactured or produced outside of a reservation and sold to non-tribal members

is not in the category of "income derived directly from the land."   *See Cook*, 86 F.3d at 1098.   In each of these cases, the courts held the State had the authority to impose a tax on cigarettes sold on an Indian reservation to *non-Indians* purchasers who intended to use or re-sell these cigarettes off the reservation.

Both State Appellate Division decisions cited by Scott held the 1842 Treaty "clearly refers to taxes levied upon real property or land."   *Snyder*, 193 A.D.2d at 331; *see, also, Bramhall*, 235 A.D.2d at 85 ("although [the 1842 Treaty] prohibits the State from taxing reservation land, [it] does not bar the imposition of excise and sales taxes on cigarettes and motor fuel sold to non-Indians on the Seneca Nation's reservations.").   In *Snyder*, the Appellate Division noted it had not been presented with "a case about land taxes, personal property taxes or income taxes, nor has any Indian been subjected to taxations."   *Snyder*, 193 A.D.2d at 335.   According to Scott, these decisions "[l]eft unaddressed . . .what the Appellate Division might have done in a case that was about income taxes, or more specifically taxes on income that possibly could be considered equivalent to taxing reservation land."   Scott, however, never considered that federal precedence had already answered these questions.

Issues relating to federal taxation focus on whether Congress has the *intention* to tax Indians while issues relating to state taxation focus on whether a state has the *authority* to tax Indians.   Felix S. Cohen, *Handbook of Federal Indian Law* 265 (1942 ed.).   *Compare Squire*, 351 U.S. at 6-7 (holding a 1887 federal statute evinces a congressional intent to create a federal income tax exemption for

11

income earned in 1943) *with Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973) *citing McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 181 (holding a state lacked the authority to tax reservation land or income from activities carried within the boundaries of a reservation absent congressional consent).   More importantly, no state court would have jurisdiction to decide whether a treaty creates an exemption from *federal* income tax.   However, the United States Supreme Court has ruled that New York and other states lack the authority to tax income earned on a reservation by an enrolled tribal member who works and lives on the reservation.  *McClanahan*, 411 U.S. 164, 181.

Although all income earned on the reservation by Alice, an enrolled Seneca who works and lives on the Seneca Nation territory, is exempt by state income taxes, she does not claim all income she earned on the Seneca Nation territory should be exempt from federal income tax.[2]   She only claims that incomes derived directly from farming, harvesting, mining or working lands to which she holds a possessory interest by deed or by lease is exempt from federal income tax.

In his report and recommendation, Scott appears to be under the mistaken belief the doctrine of *stare decisis* binds the Court to follow a summary order issued by the Second Circuit.   In *Kaid*, the Second Circuit issued its September 12, 2007

---

[2] The Perkins recognized the United States Tax Court has rejected the notion that members of the Six Nations are exempt from all federal taxation.  *See, e.g., Maracle v. Commissioner,* T.C. Memo 1991-98 (finding a Mohawk Indian could not claim federal treaties exempt income earned from off his reservation as a construction worker); *George v. Commissioner*, T.C. Memo 1989-401 (finding an Onondaga Indian could not claim federal treaties exempt income earned from as a construction worker employed off the reservation); *Nephew v. Commissioner*, T.C. Memo 1989-32 (finding a Seneca employed off the reservation as a journeyman could not claim a federal income tax exemption based on federal treaties).

summary order based on facts and issues which have no bearing to the facts or issues presented in this case.   More importantly, the Second Circuit's Local Rule 32.1.1 states, "Rulings by summary order do not have precedential effect."

As Scott stated in his report and recommendation, none of the parties in *Kaid* were enrolled Senecas or claimed "income earned from direct use of land protected by the 1842 Treaty or any other treaty."   (Dkt. 14 at 15).   Scott further acknowledged that "[i]n briefly addressing one argument out of nine presented, the Second Circuit might not have intended to reach beyond cigarettes sales to address plaintiffs' scenario or similar scenarios."  (*Id*.).

> Among nine issues raised on appeal, the defendants argued that taxing cigarettes sold on Seneca land to non-Indians violated the 1842 Treaty. The Second Circuit dispatched the argument in two sentences. "Appellants' claims that taxing cigarette sales made on reservation to non-Native Americans violates the [1842 Treaty], or New York Indian Law § 6 (McKinney 2000), are equally unavailing.  Both the treaty and the New York statute clearly prohibit ***only the taxation of real property***, not chattels like cigarettes."

(*Id.* at 13-14) (Citation omitted and emphasis added).

Scott then assumes that the Second Circuit would treat profits from gravel or minerals extracted from real property as something other than real property, instead of one of the sticks of the bundles of rights attached to real property.   He placed an undue emphasis on the phrase "taxation of real property" being modified by the word "only."  (*Id.* at 15).  In Scott's view, the Second Circuit "limited the 1842 Treaty to one specific category of taxation" and concluded Perkins' "claims and arguments here cannot survive against such a sharp limitation."  (*Id.*).   Scott concluded any argument as to whether the "more explicit language about taxes"

contained in the 1842 Treaty supported a federal income tax exemption would have

"to be made to the Second Circuit" based on the "sharp limitation" expressed in

*Kaid*.

Chief Justice Marshall, who delivered the opinion in *Marbury v. Madison,* 5

U.S. (1 Cranch) 137 (1803), speaking again for the Court in *Cohen v. Virginia,* 19

U.S. (5 Wheat) 264, 399 (1821) and commenting on his opinion in *Marbury*, stated:

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

As Chief Justice Marshall noted two centuries ago, the doctrine of stare decisis

applies when a judicial precedent attaches a specific legal consequence to a detailed

set of facts in an adjudged case or judicial decision, which is then considered as

furnishing the rule for the determination of a subsequent case involving identical or

similar material facts and binding a lower court in that judicial hierarchy.  The

Second Circuit's summary order in *Kaid* is neither mandatory nor persuasive

authority because its facts and issues have no bearing to the facts or issues

presented in this case.

## II

## THE 1842 TREATY IS THE SUPREME LAW OF THE LAND

Although the Supremacy Clause of the United States Constitution is not a source of any federal rights, it does secure federal rights created by a federal statute or treaty. *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 613 (1979). The Clause provides as follows:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI cl. 2. The Supremacy Clause imposes restrictions not only on States, but also restricts federal courts and the federal agencies, including the Internal Revenue Service, from taking any action inconsistent with an act of Congress or a treaty ratified by Congress. *See, e.g., Samann v. C.I.R.*, 313 F.2d 461, 463 (4th Cir. 1963)(finding the Supremacy Clause restricts the U.S. Treasury from enforcing regulations that contract or expand rights under an international treaty) *citing American Trust Co. v. Smyth,* 247 F.2d 149, 153 (9th Cir. 1957); *Fellows v. Blacksmith*, 60 U.S. 366, 372 (1856) (a "treaty, after executed and ratified by the proper authorities of the Government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operations, than they can behind an act of Congress.") *citing United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103 (1801)(reviewing a decision of an inferior

court of admiralty and a treaty with France), *United States v. Brooks*, 51 U.S. (10 How.) 442, 459 (1850), *Foster v. Neilson,* 27 U.S. (2 Pet.) 253 (1829).

From its inception, the United States continued the English and colonial strategy of dealing with the Seneca and other Haudenosaunee nations on a government-to-government basis through treaty-making.   Felix S. Cohen, *Handbook of Federal Indian Law* 418-19 (1942 ed.) ("The United States entered into the treaties of 1789 and 1794 with the Iroquois (Six Nations) Indians, recognizing the Indians as distinct and separate political communities capable of managing their internal affairs as they had always done.").   Under these federal treaties, the Seneca Nation and other Haudenosaunee nations were not ***given*** rights or lands by the United States; instead, Haudenosaunee relinquished claims to, and protection over, non-Haudenosaunee lands in exchange for peace and friendship and the assurance their lands and sovereignty would never be disturbed by the United States.   *Accord United States v. Winans,* 198 U.S. 371, 381 (1905) (finding a treaty is "not a grant of rights to the Indians, but a grant of right from them, [and] a reservation of those [rights] not granted."). Even though Congress ended treaty-making with Indian nations or tribes, preexisting treaties with the Seneca Nations are still in effect and contain promises, enforceable by federal court and binding federal agencies today.  25 U.S.C. § 71.

## CONCLUSION

Given the historical significance of these treaties, Plaintiffs respectfully request oral argument before this Court renders its decision and order.  Otherwise, for the reasons set forth above, Plaintiffs request the Court deny, in its entirety, the Government's motion to dismiss.

Dated:      Orchard Park, New York
              February 10, 2017

**MARGARET A. MURPHY, P.C.**

By *Margaret A. Murphy*

Margaret A. Murphy, of counsel
*Attorneys for Plaintiffs*
6506 East Quaker Street, Suite 200
Orchard Park, New York  14127
Telephone No.:  (716) 662-4186

**GARY D. BOREK, LLC**
Gary D. Borek, of counsel
Attorney for Petitioners
99 Victoria Boulevard
Cheektowaga, New York
Telephone No.: (716) 839-4321

## CERTIFICATION OF SERVICE

I hereby certify that on February 10, 2017, I electronically filed Plaintiffs' Objections to Magistrate Judge Hugh B. Scott's Report and Recommendation with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participants on this case:

GARY D. BOREK, LLC
Attorneys for Plaintiffs
Gary D. Borek, of counsel
99 Victoria Blvd.
Cheektowaga, NY 14225-4321
Email: garyborek@garyborek.com

Jordan Andrew Konig
U.S. Department of Justice
Tax Division
PO Box 55, Ben Franklin Station
Washington, D.C.  20044
Email: Jordan.a.konig@usdoj.gov

Dated:  Orchard Park, New York
        February 10, 2017

_____
MARGARET A. MURPHY

1