UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FREDRICK PERKINS and ALICE J. PERKINS,

                                    Plaintiffs,         DECISION AND ORDER
                                                                16-CV-495(LJV)

      v.

UNITED STATES OF AMERICA,

                                    Defendant.
_____


## **<u>INTRODUCTION</u>**

      This case presents what appears to be an issue of first impression: whether a treaty between the United States and Native Americans ensuring the free use and enjoyment of tribal land bars taxes on income derived directly from the land—here, the sale of gravel mined on the land. Although at least two circuit courts have suggested in dicta that "income derived directly from the land" might be exempt from taxation under such treaties, they did so to distinguish that scenario from cases where an exemption was sought for income earned in ways that do not relate to the land itself. *See Lazore v. Comm'r*, 11 F.3d 1180 (3d Cir. 1993); *Hoptowit v. Comm'r*, 709 F.2d 564 (9th Cir. 1983). This case presents the very issue about which those courts speculated. And for the reasons that follow, this Court agrees with their speculation and finds that the plaintiffs have plausibly stated a claim for relief under two treaties with the Native American Seneca Nation.

**BACKGROUND**

On June 16, 2016, Fredrick and Alice Perkins commenced this action against the United States of America. *See* Docket Item 1; *see also* Docket Item 7 (Verified Amended Complaint). The plaintiffs, one of whom is "an enrolled member of the Seneca Nation," removed gravel, with permission, from the Seneca Nation Allegany Territory and later sold it. *See* Docket Item 7 ¶¶ 1, 22-25. After receiving a "notice of deficiency" from the Internal Revenue Service, the plaintiffs paid taxes on the income from the sale. *See id.* ¶¶ 5-7. In the amended complaint,[1] they have alleged that they are owed a tax refund, interest, and penalties—totaling $9,863.68—because their income from the sale of gravel is not taxable under the Treaty with the Six Nations at Canandaigua of November 11, 1794 ("Canandaigua Treaty"), and the Treaty with the Seneca of May 20, 1842 ("1842 Treaty"). *See id.* ¶¶ 8, 10-15, 26-29. The United States has moved to dismiss the amended complaint. *See* Docket Item 9.

On September 16, 2016, this Court referred this action to Magistrate Judge Hugh B. Scott for all pre-trial matters, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). *See* Docket Item 10. On January 27, 2017, Judge Scott issued a Report and Recommendation, concluding that the motion to dismiss should be denied with respect to claims under the Canandaigua Treaty but granted with respect to claims under the 1842 Treaty. *See* Docket Item 14 (Report and Recommendation). Both parties

---

[1] After the plaintiffs filed their complaint in June 2016, the government filed a motion to dismiss. *See* Docket Item 5. The plaintiffs filed an amended complaint on September 6, 2016, Docket Item 7, and the government filed an amended motion to dismiss on September 14, 2016. Docket Item 9. On September 19, 2016, Magistrate Judge Hugh B. Scott deemed the first motion to dismiss superseded by the amended motion. *See* Docket Item 11 (Text Order).

objected, and after the objections were fully briefed, *see* Docket Items 15, 16, 19, 20, 21 & 22, this Court heard oral argument.

Based on the analysis below, this Court adopts the recommendation of Judge Scott regarding the claims under the Canandaigua Treaty but rejects the recommendation regarding the claims under the 1842 Treaty. Accordingly, the government's Motion to Dismiss (Docket Item 9) is denied.

## **DISCUSSION**

### I. REVIEW OF REPORT AND RECOMMENDATION

This Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and "may accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3); *see* 28 U.S.C. § 636(b)(1).

### II. MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Courts assess Rule 12(b)(6) motions "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 61 (2d Cir. 2010) (internal

quotation marks and citation omitted). "On a motion to dismiss, the court may consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001) (internal quotation marks and citation omitted).

### III. ANALYSIS OF THE PLAINTIFFS' CLAIMS

*A. Principles of Income Tax Application*

The Internal Revenue Code defines gross income as "all income from whatever source derived." I.R.C. § 61(a). At the same time, Code provisions must be applied "with due regard to any treaty obligation of the United States." I.R.C. § 894(a)(1). Here, the plaintiffs claim that their income from the sale of gravel from Seneca land is exempt from federal income tax based on two treaties with the Seneca Nation. *See* Docket Item 7 ¶¶ 3, 10-15.

*B. Principles of Statutory and Treaty Construction*

Dueling principles of statutory and treaty construction are in tension in this case.

To be valid, exemptions to tax laws should be clearly expressed. *Squire v. Capoeman*, 351 U.S. 1, 6 (1956). On the other hand, even if they are not clearly expressed, tax exemptions can be found in so-called Indian treaties by using established—and liberal—principles of treaty construction. So-called Indian treaties should be "interpreted liberally in favor of the Indians, with any ambiguities . . . resolved in their favor." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999). The words in treaties must be construed "not according to their technical meaning, but 'in the sense in which they would naturally be understood by the Indians.'"

4

*Lazore*, 11 F.3d at 1184 (quoting *Jones v. Meehan*, 175 U.S. 1, 11 (1899)). And any "doubts concerning the meaning of a treaty with an Indian tribe should be resolved in favor of the tribe." *Oregon Dep't. of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766 (1985).

In reconciling the tension between these principles of construction, the circuits appear divided on the point at which the favorable standard of construction should be applied to treaties in tax-exemption cases. The Third Circuit has suggested that one can use the liberal rules of treaty interpretation to find an exemptive purpose. *Lazore*, 11 F.3d at 1184 ("The effect of these rules of interpretation is to make it possible for language that could not have been concerned with the income tax to nevertheless create an exemption from it."). The Ninth Circuit, on the other hand, has found that "when reviewing a claim for a federal tax exemption, we do not engage the canon of construction favoring the Indians unless express exemptive language is first found in the text of the statute or treaty." *Ramsey v. United States*, 302 F.3d 1074, 1079 (9th Cir. 2002).[2] But "express" exemptive language need not be explicit: language that shows the "federal government's *intent* to exempt Indians from taxation" creates an exemption, with words such as "free from incumbrance," "free from taxation," or "free from fees" sufficient to make that showing. *Id.* at 1078-79 (emphasis added).

---

[2] Regardless of when the liberal standard of interpretation applies, it has its limits: "even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943).

5

*C. The Plaintiffs' Claims under the Canandaigua Treaty*

The plaintiffs argue that their income from the sale of gravel from Seneca land is tax exempt under the Canandaigua Treaty. *See* Docket Item 7 ¶¶ 10-14. In that treaty, the United States

> acknowledge [sic] all the land within the aforementioned boundaries, to be the property of the Seneka [sic] nation; and the United States will never claim the same, nor disturb the Seneka [sic] nation, nor any of the Six Nations, or of their Indian friends residing thereon and united with them, in the *free use and enjoyment* thereof.

Docket Item 14-1 at 2 (Canandaigua Treaty, art. III, Nov. 11, 1794, 7 Stat. 44) (emphasis added). The plaintiffs claim that taxes on the land itself, or on income derived from the land, would have been viewed by the Seneca Nation as a burden on its free use and enjoyment of that land. *See* Docket Item 7 ¶ 14. For that reason, the plaintiffs argue, the treaty exempts the Seneca Nation and "their Indian friends" from such taxes.

Two circuit court cases support that argument—at least in dicta. In *Hoptowit*, the Ninth Circuit held that a Native American's income from service as a Tribal Council member was not tax exempt, but it noted that under the Treaty with the Yakima there might be an exception "limited to income produced directly by reservation land." 709 F.2d at 566.[3] Likewise, in analyzing the Canandaigua Treaty itself, the Third Circuit held that a Native American's income from work for a logging company operating on Indian land was not tax exempt, but it observed that the "free use and enjoyment"

---

[3] The language of the Treaty with the Yakima of 1855, art. II, mirrors that in the Canandaigua Treaty: the "tract [given to the Yakima] shall be set apart . . . for the exclusive use and benefit of said confederated tribes and bands of Indians." *Hoptowit*, 709 F.2d at 566.

6

clause "might be sufficient to support an exemption from a tax on income derived directly from the land." *Lazore*, 11 F.3d at 1187.

In his Report and Recommendation, Judge Scott found that the present case "potentially fills in the case law with a rare demonstration of how a direct connection to Indian land would actually look." Docket Item 14 at 13. Given the exemptive language of the Canandaigua Treaty, the principle of liberal construction of Indian treaties, and the close connection between mining gravel and "enjoyment of the land," this Court agrees.

Indeed, under any rule of construction, taxing income from gravel mined on land that is part of the Seneca territory interferes with "the free use and enjoyment" of that land. When the liberal rules of construction are applied to the language of the Canandaigua Treaty, that conclusion is even more compelling. For that reason, and for the reasons included in Judge Scott's analysis, the plaintiffs have indeed stated a viable claim that the Canandaigua Treaty exempts the income at issue here from tax.

The government argues that even if the Seneca Nation has a tax exemption under the Canandaigua Treaty, the plaintiffs, as individuals, are not exempt. *See* Docket Item 15 at 2-3 (Objection to the Report and Recommendation). The government distinguishes between a "true" possessory interest in the land, which it concedes the Seneca Nation might have and which could potentially bestow a tax exemption, and the plaintiffs' "mere" permit to use the land, which the government claims does not warrant a tax exemption for them. *Id.* at 3.

The government's argument is misplaced. The Canandaigua Treaty provides that "the United States will never . . . disturb the Seneka [sic] nation," or "*their Indian*

7

*friends residing thereon and united with them*, in the free use and enjoyment" of the Seneca land. Docket Item 14-1 at 2 (Canandaigua Treaty, art. III) (emphasis added). The Canandaigua Treaty thus benefits not only the Seneca Nation itself, but also its "Indian Friends" residing on and using the nation's land. On a motion to dismiss, the facts pleaded in the complaint are accepted as true, and here the amended complaint alleges that plaintiff Alice Perkins is a member of the Seneca Nation and has leasehold and permit rights to mine and sell gravel. *See* Docket Item 7 ¶¶ 1, 21, 22, 25. The plaintiffs thus have stated a plausible claim for relief as "Indian Friends" under the Canandaigua Treaty.

   D. *The Plaintiffs' Claims under the 1842 Treaty[4]*

   Judge Scott found that the government's motion to dismiss the plaintiffs' claims arising under the 1842 Treaty should be granted. He relied on the Second Circuit's decision in *United States v. Kaid*, 241 F. App'x 747 (2d Cir. 2007), in reaching that conclusion.

   Like the Canandaigua Treaty, the 1842 Treaty appears on its face to provide a tax exemption. In fact, the tax exemption in the 1842 Treaty is even more explicit:

> The parties to this compact mutually agree to solicit the influence of the Government of the United States to *protect* such of the lands of the Seneca Indians, within the State of New York, as may from time to time remain in their

---

[4] "Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so." *Mille Lacs Band*, 526 U.S. at 202. The terms of the 1842 Treaty do not specifically abrogate the Canandaigua Treaty. Article I of the 1842 Treaty states that the Seneca will "*continue* in the occupation and enjoyment of the whole of the said two several tracts of land . . . *with the same right and title in all things*, as they had and possessed therein immediately before the date of the said indenture." Docket Item 14-2 at 2 (1842 Treaty, art. I). Therefore, if the "free use and enjoyment" language of the Canandaigua Treaty exempts the income here from tax, that exemption was not abrogated by the 1842 Treaty.

8

> possession *from all taxes*, and assessments for roads, highways, or any other purpose until such lands shall be sold and conveyed by the said Indians, and the possession thereof shall have been relinquished by them.

Docket Item 14-2 at 5 (1842 Treaty, art. IX) (emphasis added).

Judge Scott interpreted the explicit tax exemption in the 1842 Treaty to apply solely to taxes on real property. In reaching that conclusion, he relied on *Kaid*, Docket Item 14 at 15, a case in which the Second Circuit addressed the claim that "taxing cigarette sales made on reservations to non-Native Americans violates the Treaty with the Seneca." *Kaid,* 241 F. App'x at 750. Finding that claim "unavailing," the Second Circuit stated that "[b]oth the treaty and the New York statute clearly prohibit only the taxation of real property, not chattels like cigarettes." *Id.* at 750-51 (citing *Snyder v. Wetzler*, 193 A.D.2d 329, 603 N.Y.S.2d 910 (3d Dep't 1993), *aff'd*, 84 N.Y.2d 941, 644 N.E.2d 1369 (1994)).

Judge Scott read the Second Circuit's language to mean that the 1842 Treaty proscribed only taxes on real property itself, and he concluded that the plaintiffs therefore were not exempt from income tax under that treaty. *See* Docket Item 14 at 15. The government likewise reads *Kaid* as "unambiguous guidance" on the issue presented here and agrees with Judge Scott's reliance on it. *See* Docket Item 19 at 2.

This Court disagrees. First, although *Kaid* might have persuasive value, it is not a precedential decision because it is a summary order published in the Federal Appendix. "Rulings by summary order do not have precedential effect." 2d Cir. R. 32.1.1(a) (citation of summary orders); *see also Lebron v. Sanders*, 557 F.3d 76, 77 n.2 (2d Cir. 2009) ("we recognize that the summary order cited by the district court has no precedential effect under our rules") (citing 2d Cir. R. 32.1, currently 2d Cir. R. 32.1.1).

9

So even if *Kaid* stood for the proposition for which Judge Scott and the government read it, it would not compel the conclusion they reach.

What is more, *Kaid* did not address—and there is no reason to believe the court even considered—the issue presented here. *Kaid* dealt with cigarettes made from tobacco brought *onto* Seneca land—not products *of* that land, such as gravel, timber, or crops. So when the Second Circuit distinguished between cigarettes and real property and found that the treaty applied only to the latter, it was not considering whether taxing income from the products of the real property might also be prohibited by the treaty. Indeed, there is no reason to believe that the Court even thought about taxing the products of the real property, the relevant issue here. Moreover, the parties objecting to the tax in *Kaid* were not Native Americans. *See Kaid*, 241 F. App'x at 750. So *Kaid* says little, if anything, about the issue presented in this case.

The plain language of the treaty, on the other hand, does address—and resolve—the issue. The treaty protects "the lands of the Seneca Indians . . . from *all taxes*." Docket Item 14-2 at 5 (1842 Treaty, art. IX) (emphasis added). Given the liberal principles of treaty construction that apply here, there is no reason to believe that one rule would apply to taxing the dirt, gravel, and foliage that make up the property and another to the property itself—if "the property" can even be distinguished from the dirt, gravel, and foliage that comprise it. In other words, the language of the 1842 Treaty provides no reason to distinguish between exemptions from what we think of as a real property tax and exemptions from a tax on what makes up that real property. So the government's motion to dismiss is denied under the 1842 Treaty as well.

**CONCLUSION**

Given the liberal construction of treaties between the United States and Native American tribes, the distinction between taxing land and taxing the gravel that makes up that land cuts the baloney too thin. Accordingly, and for the reasons set forth above, the government's Motion to Dismiss (Docket Item 9) is DENIED. This matter is referred back to Judge Scott consistent with the Order of Referral already in place. *See* Docket Item 10.

IT IS SO ORDERED.

Dated: August 4, 2017

Buffalo, New York

*s/Lawrence J. Vilardo*
LAWRENCE J. VILARDO
United States District Judge