UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Fredrick Perkins and Alice J. Perkins,

                             Plaintiffs,

            v.

United States of America,

                             Defendant.

**Report and Recommendation**

16-CV-495V

## I.    INTRODUCTION

"The federal income taxation of American Indians is not a sexy topic."  John Lentz, *When Canons Go to War in Indian Country, Guess Who Wins? Barrett v. United States: Tax Canons and Canons of Construction in the Federal Taxation of American Indians*, 35 Am. Indian L. Rev. 211, 211 (2011).  Neither is gravel.  Yet the two topics have come together in this case to present a question that no prior case has had to answer directly.  When Indians extract gravel from Indian land through an Indian-owned sole proprietorship, is the resulting income exempt from federal income tax based on treaties that promise the "free use and enjoyment" of land or protection from "all taxes"?  And even if the Court answers in the affirmative, have plaintiffs Fredrick Perkins ("Fredrick") and Alice J. Perkins ("Alice") made enough of a showing of business income and expenses that treaty protection would make a practical difference on their 2010 federal income tax return?  On the flipside, has defendant United States of America demonstrated, beyond the reach of any reasonable jury, that plaintiffs underreported income and overreported expenses in 2010, such that treaty protection cannot give them a refund?

The parties bring these questions before the Court by way of their cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("FRCP").  (Dkt. Nos. 60,

61.)  District Judge Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 10.)  The Court held oral argument on July 11, 2018.  For the reasons below, the Court respectfully recommends denying both motions for summary judgment.  The Court also recommends denying defendant's related motion to strike (Dkt. No. 70).

## II.   BACKGROUND

Although the basic facts of the case are well known by now, the Court will provide a summary that reflects new details appearing in the parties' motion papers.

This case revolves around two related issues: 1) plaintiffs believe that they were overcharged on income tax for the year 2010; and 2) plaintiffs believe that correcting the overcharge requires invoking two Indian treaties in a way that defendant strongly opposes.  The treaties in question are the Treaty with the Six Nations of 1794 (the "Canandaigua Treaty")[1] and the Treaty with the Seneca of 1842 (the "1842 Treaty").[2]

Alice is an enrolled member of the Seneca Nation of Indians ("Seneca Nation").  Fredrick is Alice's husband; he is not a member of the Seneca Nation, but he lives with Alice on the Allegany Territory.  In 1985, Alice founded A&F Trucking, a sole proprietorship registered with the Cattaraugus County Clerk's office.  (Dkt. No. 60-5 at 2.)  In the beginning, according to Alice, A&F Trucking had only Alice and Fredrick as employees and only a dump truck as notable business equipment.  (Dkt. No. 61-2 at 5.)  The company essentially was a hauling company, though it later

---

[1] Treaty Between the United States of America, and the Tribes of Indians called the Six Nations, Haudenosaunee-U.S., Nov. 11, 1794, 7 Stat. 44.

[2] Treaty Made and concluded at Buffalo Creek, in the State of New York, on the twentieth day of May in the year one thousand eight hundred and forty-two, between the United States of America, acting herein by Ambrose Spencer their Commissioner, thereto duly authorized, on the one part, and the chiefs, headmen and warriors of the Seneca nation of Indians, duly assembled in council, on the other part, Seneca-U.S., May 20, 1842, 7 Stat. 586.

acquired a backhoe and expanded services to excavating, paving, snowplowing, and site development. (*Id.*) By 2010, A&F Trucking had seven employees. (*Id.* at 13.)

The events that would later give rise to this case started in the 1990s. Alice became aware of a state highway reconstruction project that, *inter alia*, would require some quantity of gravel. (*Id.* at 5–6.) Alice decided that she wanted to add gravel operations to her business, but she had to clear two hurdles. The first hurdle was a practical one—access to gravel from an existing pit. Alice solved this problem when an enrolled Seneca named Alton Jimerson approached her with a desire to have her operate a gravel pit that he owned on Seneca Nation property. (Dkt. No. 60-5 at 11.) The arrangement continued with the subsequent owner of the gravel pit after Mr. Jimerson died. (*See, e.g.,* Dkt. No. 61-2 at 7, 73, 75.) The second hurdle was permission from the Seneca Nation. From the 1990s until June 13, 2009, Alice obtained whatever permits were necessary to allow for gravel extraction from the gravel pit. Alice has asserted that she had one employee dedicated to gravel extraction and stockpiled gravel at her business for subsequent sale. (*Id.* at 13; Dkt. No. 72-1 at 14.) Alice did not physically extract the gravel herself but visited the pit frequently "just to make sure everything was okay." (Dkt. No. 60-5 at 22.) As part of the agreement, Alice paid royalties to the Seneca Nation. (*Id.* at 15.) On June 13, 2009, the Seneca Nation declined to renew Alice's permit. (Dkt. No. 61-2 at 12, 81.) The Seneca Nation nonetheless permitted Alice to sell whatever gravel she had stockpiled up to that point. (*Id.* at 83.) Plaintiffs finished selling off the stockpiled gravel in 2010. (*Id.* at 14.)

The immediate cause of this litigation was the way in which plaintiffs chose to account for income from the stockpiled gravel when they filed their 2010[3] tax return. In their original 2010 tax

---

[3] Plaintiffs used similar accounting for their 2008 and 2009 tax returns. For reasons explained on prior occasions (Dkt. No. 38 at 3), plaintiffs elected to seek relief in the United States Tax Court ("Tax Court") for issues related to their 2008 and 2009 tax returns.

return, prepared by a third party (Dkt. No. 60-5 at 28), plaintiffs listed $184,552 of "other costs" that

affected their cost of goods sold.  (Dkt. No. 60-13 at 5.)  Plaintiffs disclosed that this "other cost"

actually was gravel income not subject to federal income tax in accordance with the Indian General

Allotment Act of 1887 ("IGAA"), 24 Stat. 388 (1887) (codified as amended at 25 U.S.C. §§ 334, 339,

341, 342, 348, 349, 354).[4]  (*Id.* at 8–9.)  During her deposition, Alice explained how her tax preparer

proposed the idea of exempt gravel income:

> Q. What do you remember about when you started to take that position [*i.e.*, treaty-
> based exemptions] with the IRS?
>
> A. All I know is when I started I was paying income tax on everything.  I did for
> years and years and I remember going into Bob Ellis's office and Joe Stevens
> was standing there and he says just I'm gonna throw something by you.
> We've got all these loggers and we've got all these other people.  They are
> claiming they're exempt from this due to a treaty.  So he's actually the one
> that said you know, would you—what do you think of that?
>
> I wasn't sure because I don't—I don't like to be in the wrong.  I mean I don't like to
> do something wrong and I remember complaining about it and complaining
> about it to my husband.  I was like he's recommending this and I'm not sure.
>
> Then they come across—a friend of his come[s] across with this book and showed
> me in there and I don't remember the name of the book.  It's been so long,
> but it said that, so I said okay, well, then yeah, we'll do it.

(Dkt. No. 60-5 at 29.)  Alice further explained how she provided her tax preparer with information

that would be used for the tax return:

> Q. How did you provide—how did you provide the information that led to that
> number for your tax preparer?
>
> A. A lot of times I could go off my gravel reports because there's invoice numbers
> and I could go back through—I have to go back through my invoices
> manually because there were no computers, no QuickBooks, and actually pull
> out the gravel, anything that was sold for gravel.

---

[4] For background purposes, the Court is noting what plaintiffs actually put on their 2010 tax return.  The
parties have since agreed that the IGAA does not apply to the Seneca Nation.  *See* 25 U.S.C. § 339.

Q. So you sort of did a manual separation of money you got from gravel sales and money you got from non gravel business?

A. Right, but I could go back to my gravel reports and look at those too because they are listed on my gravel reports.  Every invoice is on my gravel report.

Q. So did you have to kind of put a bunch of paper in front of you, first you had your bank statements and then you had the gravel reports and you kind of looked to make sure this goes into the pile of gravel sales and this goes into the pile of non gravel sales and you kind of manually separated out so you could let him know what was tax exempt income?

A. I just gave him the total amount of what I had to pay to the Seneca Nation and I knew how much income was in those invoices.

(Dkt. No. 60-5 at 31–32.)

The claiming of the tax exemption led plaintiffs to claim a negative adjusted gross income of $144,253 and a refund of $15.  (Dkt. No. 60-13 at 1–2.)  The Internal Revenue Service ("IRS") audited plaintiffs and assessed them a deficiency of $9,863.68, which included $6,113 of underreported tax plus various penalties and interest.  (Dkt. No. 7 at 12.)  Plaintiffs elected to pay the deficiency in full and then seek a refund under 26 U.S.C. §§ 6402 and 6511.  As part of their request for a refund, plaintiffs filed an amended tax return that again asserted the $144,253 of negative adjusted gross income.  (*Id.* at 10.)  Unlike in the original tax return, which cited the IGAA, plaintiffs now cited federal treaties as the basis for the tax exemption.  (*Id.* at 11.)  Plaintiffs did not specify the treaties.

When the IRS failed to respond to the claim for a refund within six months, *see* 26 U.S.C. § 6532(a)(1), plaintiffs filed suit here under 26 U.S.C. § 7422.  The current operative complaint, the amended complaint, essentially contains one claim for a refund of $9,863.68, plus costs and fees. (*Id.* at 6.)  Plaintiffs rest their claim on the application of the Canandaigua Treaty and the 1842 Treaty.  Those treaties, according to plaintiffs, support the $144,253 of negative adjusted gross income, which in turn would require the refund.  Defendant filed an amended answer with a

5

demand for jury trial on March 29, 2018.  (Dkt. No. 46.)  Among other assertions, defendant denied

that plaintiffs correctly reported income from gravel sales as tax-exempt.  (*Id.* at 7.)  Defendant

further asserted the following as a fifth affirmative defense:

> Plaintiffs are not entitled to a refund of income, taxes, penalties, and interest, because the income taxes Plaintiffs paid to the United States for tax year 2010 do not exceed the amount that Plaintiffs owed to the United States in taxes for that year. *See Lewis v. Reynolds*, 284 U.S. 281, 283 (1932).  Plaintiffs under-reported their gross receipts or sales and over-reported the costs of goods sold and expenses, resulting in their reporting and paying a lower amount of tax than was legally due.

(*Id.* at 2.)

The ability of the two treaties in question to support a cognizable claim for a refund was

addressed during proceedings for defendant's motion to dismiss.  (Dkt. No. 9.)  This Court

recommended to Judge Vilardo that the Canandaigua Treaty potentially supported plaintiffs' claim

for a refund, subject to discovery, while the 1842 Treaty did not.  (*See generally* Dkt. No. 14.)  Judge

Vilardo decided that plaintiffs had a cognizable claim under both treaties.  (*See generally* Dkt. No. 24.)

For reasons that will be discussed in more detail later, the Court notes that Judge Vilardo's decision

issued on August 4, 2017.  Judge Vilardo's decision issued months before a decision from the Tax

Court—in plaintiffs' case concerning the 2008 and 2009 tax years—that applied neither the law of

the case doctrine nor the collateral estoppel doctrine to Judge Vilardo's analysis.  *See generally Perkins*

*v. Comm'r*, No. 28215-14, 2018 WL 1146343 (T.C. Mar. 1, 2018).

The parties filed dispositive motions on May 18, 2018.  Plaintiffs seek summary judgment on

their refund claim for several reasons.  Plaintiffs again rely on the Canandaigua Treaty and the 1842

Treaty to support their assertion that A&F Trucking generated a substantial amount of tax-exempt

income in 2010.  To the extent that defendant is arguing again that the treaties in question did not

lead to any tax-exempt income, plaintiffs note that Judge Vilardo's Decision and Order is the law of

the case:

As set forth in 26 U.S.C. § 7481(a)(2), "the decision of the Tax Court shall become final" once the decision has been affirmed or an appeal has been dismissed by federal appellate courts.  Plaintiffs, therefore, have the right to file a notice of appeal to have any dispositive decision rendered by the Tax Court reviewed by the Second Circuit and the right to petition for certiorari before the United States Supreme Court.  In other words, it may be years before a final judgment can be issued relating to the matters now pending before the Tax Court.  "What matters to the Court is that, as of now, neither *res judicata* nor collateral estoppels override plaintiffs' statutory right to pursue relief in two different fora, each of which still has to resolve some important factual questions."  (Docket Entry No. 53 at 5).

Second, the Tax Court's opinion does not set forth any "new evidence."  In fact, Tax Court Judges Lauber and Pugh, who concurred in part and in the result and with whom eight other judges concurred with their opinion, are stunningly misinformed as to the historical facts of the 1842 Treaty, royalty payments made to the Seneca Nation, and the plenary powers of Congress over Indian affairs.  (Docket Entry No. 43-2 at 21–28).

(Dkt. No. 62 at 11.)  Plaintiffs then turn to documenting the need for a refund.  Plaintiffs acknowledge underreporting gross income but deny overreporting business expenses.  (Dkt. No. 62 at 17.)  More importantly to plaintiffs, they argue that the real question is not any underreporting or overreporting in itself, but ultimately whether they paid more tax in 2010 than they should have.  To that question, plaintiffs say yes:

Alice Perkins has shown that her gross taxable income in 2010 totaled $752,515 and that gross revenue from the sale of materials mined from the lands of the Seneca Nation totaled $177,108.16.  She claims income generated by the sale of sand, stones, rocks, and fill dirt, mined prior to June 13, 2009, is tax exempt.  She does not claim trucking charges or delivery fees relating to the sale of sand or gravel are tax-exempt and have included these charges and fees as part of her gross taxable income.  Alice has not included IN her taxable gross income, checks received in 2009, but not deposited until 2010.

*****

With regard to Alice's deductible business expenses, she has identified and described each and every deductible expense necessary for the production of taxable income.  She claims no deduction for any expenses, relating in whole or in part to tax-exempt sales.  She has set forth those expenses subject to allocation and the breakdown for each allocable expense.

7

Plaintiffs have submitted more than 1,400 pages of evidence, showing Alice's "deductible business expenses allocated to the undisputed taxable income exceed the undisputed amount of taxable revenue . . . ." The evidence submitted is sufficient for a Government auditor to again review Alice's business records kept for accounting and tax purposes. Plaintiffs have also presented to the Court the affidavit of John Pawlak, a certified public accountant. At this stage of the proceedings, Mr. Pawlak serves only as a summary witness and not as an expert witness. His affidavit is submitted to the Court for the purposes of assisting the Court in summarizing and calculating Alice's net taxable income, if any. In his affidavit, Mr. Pawlak finds Alice Perkins doing business as A&F Trucking has no net taxable income in 2010. If the Court were to find the income generated from the sale of materials mined from land on the Seneca Nation territory was exempt, Mr. Pawlak concludes Alice and her husband would be entitled to a refund.

(*Id.* at 18–20.)

Defendant opposes plaintiffs' efforts at summary judgment and seeks summary judgment for itself. Central to defendant's cross-motion is the explicit argument that the Tax Court's 2018 decision—in which the Tax Court reached the opposite conclusion about the treaties in question—will soon achieve finality and an implicit argument that the impending finality supersedes any collateral estoppel effect from Judge Vilardo's Decision and Order:

This Court certainly has jurisdiction to consider Plaintiffs' request for a refund of taxes paid for 2010, even though the lawsuit relies on the same legal and factual basis as Plaintiffs' earlier-filed Tax Court case challenging their 2008 and 2009 tax assessments. *See, e.g., Bush v. Comm'r*, 175 F.2d 391, 392–93 (2d Cir. 1949) ("each year is the origin of a new liability and a separate cause of action"). Plaintiffs are allowed their day in each court. But just because Plaintiffs may invoke the jurisdiction of two forums to litigate identical issues does not relieve them of the effects of estoppel. Plaintiffs soon will be barred from raising their claim of treaty-based tax exemption because that claim is "identical in all respects with that decided in the first proceeding and … the controlling facts and applicable legal rules remain unchanged." *Id.* at 393.

This lawsuit will be "redundant litigation of the identical question of the statute's application to the taxpayer's status." *Sunnen*, 333 U.S. at 598. Plaintiffs' claims of tax exemption are identical in both suits—the controlling facts and the applicable legal rules that apply to Plaintiffs' failed challenges to IRS deficiency notices for 2008 and 2009 are essentially, if not entirely, identical to their claims for 2010. In short, the Tax Court's rejection of Plaintiffs' theory of tax exemption, once finalized by judgment, will bar Plaintiffs' claims in their entirety.

(Dkt. No. 60-1 at 31–32.)  The impending finality also, in defendant's view, helps set up the

assertion that the Tax Court decision inherently should receive more weight:

> The gateway issue in this lawsuit is whether income "derived directly from
> the land" is exempted from income tax under the Canandaigua Treaty, the 1842
> Treaty, or a general presumption that allegedly applies to income resulting from
> Seneca land.  Fully 14 of the 15 participating members of the Tax Court, considering
> the identical issue in that proceeding, answered a resounding "no."  That
> determination should guide this Court's analysis of the same argument.

(*Id.* at 22.)  After identifying the treaties in question as a "gateway issue" and arguing against their

applicability, defendant makes an alternative argument that "Plaintiffs cannot obtain an advisory

opinion establishing that some of their income is tax exempt where they cannot prevail on the

primary issue of whether they are due a refund of income taxes."  (*Id.* at 40.)  Combining the

treaty/tax exemption issue with plaintiffs' conceded underreporting issue, defendants then argue

that "A&F Trucking's total income in 2010 actually amounted to over $950,000—not the $711,457

they reported to the IRS.  Because Plaintiffs under-reported their gross receipts by $240,785.92, they

still would not be entitled to a refund even if they succeed on their claim that $184,552 of gravel

income was tax exempt."  (*Id.* at 39.)

   After attacking the competency of the business records that plaintiffs have submitted—a

matter that the Court will address further below—defendant questions how plaintiffs calculated their

taxable and tax-exempt income:

> Even if the Court considers the hearsay documents submitted by Plaintiffs,
> Plaintiffs' contention that they earned a total of $742,515 in non-gravel income is
> based upon an incorrect and untrustworthy method of calculation.  Plaintiffs now
> contend that, because A & F Trucking operates on a cash basis, their 2010 income
> must be calculated by including only checks received in calendar year 2010, no matter
> when deposited.  *See* A. Perkins Aff. at ¶¶ 77 & 78.  However, this accounting
> method is inconsistent with Plaintiffs' prior practice, would result in income being
> unreported and untaxed, violates Plaintiffs' duty of consistency in tax reporting, and
> its accuracy cannot be verified by the incomplete records provided to the Court.

Plaintiffs' 2008, 2009, 2010, and 2011 tax returns reflect as income only items deposited into the A & F Trucking bank account during each calendar year (no matter when received).  In her sworn deposition testimony, Alice Perkins confirmed that for 2008, 2009, 2010, and 2011, Plaintiffs reported as their income the deposits they made between January 1 and December 31 of each year.  Doc. No. 60-5 at 163 ¶ 20 – 165 ¶ 4.  Her contradictory affidavit testimony must therefore be disregarded. *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995).

IRS Revenue Agent Elizabeth Nix audited Plaintiffs' 2008, 2009, and 2010 income tax returns.  Alice Perkins stated to Agent Nix that A & F reported gross receipts for those years entirely based upon total yearly bank deposits.  Ex. 1 at ¶ 8.  Agent Nix then conducted a bank analysis and included as taxable income for 2008 and 2009 only those checks deposited in each calendar year.  *Id.* at ¶¶ 12-15.  The IRS notice that was attached to Plaintiffs' Tax Court petition confirms that Agent Nix calculated Plaintiffs' gross income based only on the deposits in each calendar year ("bank deposits less non-taxable sources of deposits"), since Plaintiffs' records were inadequate to calculate A & F's income by any other method.  *Id.* at ¶¶ 10 & 13; *see also* Ex. 2 at 16-17.

Plaintiffs recently conceded that their belated change in accounting method would require a re-calculation of other tax years in order to properly report all gross receipts.  On May 24, 2018, Plaintiffs stated that their new position means that "they had been reporting 2010 income in 2011, 2009 income in 2010, 2008 income in 2009, and 2007 income in 2008."  *See* Ex. 3 at ¶ 9.  However, Plaintiffs did not challenge the IRS's determination of their non-gravel income in their Tax Court case and therefore were deemed to have conceded that issue.  *See* Perkins, 2018 WL 1146343, at *2 n.3.  Plaintiffs' 2008 and 2009 income and expenses are final.

(Dkt. No. 71 at 22–23.)  Defendant raises other questions about "unexplained redactions and omissions" in plaintiffs' bank statements.  (*Id.* at 24.)  Finally, defendant argues that plaintiffs have not set forth a reliable method for explaining a significant change in their business expenses:

The inadmissible documents submitted to identify A & F's business expenses—even if considered by the Court—also cannot justify summary judgment.  Plaintiffs reported on their 2010 tax return (under penalties of perjury) that A & F Trucking had $340,046 in deductible business expenses.  *See* Doc. No. 60-13 at 2 & 4.  Those business expenses generally matched the summary of income and expenses Plaintiffs maintained with their records from 2010 that were turned over during discovery.  *See* Doc. No. 60-17.  In their summary judgment motion, however, Plaintiffs now submit that they actually incurred over $775,000 of business expenses during 2010—well over double the amount they reported to the IRS six years ago.  *See* Doc. No. 60-13 at 2 & 4.  Plaintiffs for the first time contend that they incurred significant expenses for contract labor, supplies, and repairs and maintenance.  *See* Doc. No. 61-4 at 10.  If proved, the previously-unreported $291,116 would increase

their deductible costs to $776,084—barely sufficient to entitle Plaintiffs to a tax refund based on $775,135 of business income.  But the only reliable evidence (Plaintiffs' sworn 2010 income tax return) shows that Plaintiffs' income significantly exceeded their deductible expenses, even if their gravel income was tax exempt.

Alice Perkins states that she incurred "business deductions totaling $778,983[,]" A. Perkins Aff. at ¶ 146, but Mr. Pawlak's inadmissible summary document claims $776,084 in total expenses, *see* Doc. No. 61-4 at 10.  Even Plaintiffs seem unable to determine the amount of deductible 2010 expenses from the documents they have submitted.  In addition, Plaintiffs concede that some of their alleged expenses cannot be supported by documentary evidence, since "[s]ome of the receipts had faded and were illegible, or were missing."  A. Perkins Aff. at ¶¶ 100 & 109.  Plaintiffs ask the Court to trust that they correctly estimated their expenses from eight years ago.  *Id.*  Those estimated expenses appear to surpass $949—the amount by which A & F's newly-alleged business costs exceed their 2010 income. *See id.* at ¶¶ 109-117.

Although Plaintiffs urge that the 1,400 pages of documents submitted with their summary judgment motion would be "sufficient for a Government auditor to again review Alice's business records kept for accounting and tax purposes," Doc. No. 62 at 20, that is incorrect.  The three reams of paper deposited with the Court cannot be categorized into taxable income and deductible expenses without some method of tying the records to the asserted deductions.  *See* Ex 1 at ¶ 27.  For example, the front of cancelled checks, alone, would not prove that the $151,697 that A & F Trucking paid to Rick Perkins Contracting were deductible costs.  *Id.* at ¶¶ 20–21.  Even if an IRS official believed that Plaintiffs actually incurred nearly $300,000 in previously-unreported expenses, the IRS still would require additional information to establish that all such payments were deductible. *See id.* at ¶¶ 20-21 & 27.

(*Id.* at 25–26.)

## III.   DISCUSSION

### A.  *Motion to strike (Dkt. No. 70)*

Before the Court addresses the heart of the parties' motions for summary judgment, it needs

to make a recommendation[5] about defendant's motion to strike plaintiffs' summary-judgment

evidence.  Defendant wants the Pawlak affidavits disregarded for two related reasons.  Defendant

---

[5] Motions to strike are non-dispositive but can be addressed with a recommendation when intertwined with dispositive motions.  *See Zhao v. Kaleida Health*, No. 04-CV-467-JTC JJM, 2008 WL 346205, at *1 n.1 (W.D.N.Y. Feb. 7, 2008); *Krause v. Buffalo & Erie Cty. Workforce Dev. Consortium, Inc.*, 425 F. Supp. 2d 352, 357 n.1 (W.D.N.Y. 2006).

believes that plaintiffs intend to have Pawlak regarded as an expert witness, in which case it would want Pawlak precluded under Rule 37(c) for failure to disclose. Additionally, defendant objects to any attempt to evade requirements for expert disclosure by labeling the Pawlak affidavits as "summary affidavits." Next, defendant would have the Court disregard the entirety of the business records that plaintiffs have submitted with their motion for summary judgment. "Plaintiffs have failed to submit any affidavit sworn by anyone qualified to speak from personal knowledge that the 1,400 pages of documents were authentic or admissible; it is not clear that they could do so, given the nature of the documents. *All* of the exhibits supporting Plaintiffs' argument that their business expenses exceeded their taxable income are inadmissible hearsay, and certain documents plainly were obtained or altered for the purposes of Plaintiffs' motion." (Dkt. No. 70-1 at 7.)

Plaintiffs oppose the motion to strike in its entirety. Addressing the business records first, plaintiffs assert that the records were not prepared for litigation and that Alice will be able to authenticate them for trial. "Alice has maintained these bank statements, credit card statements, deposit slips, deposited checks, cancelled checks, customer invoices, vendor invoices and receipts, utility and telephone bills, quarterly payroll records, property tax receipts and a list of depreciable assets as records kept in the ordinary course of her business for accounting and tax purposes." (Dkt. No. 74-2 at 8.) Plaintiffs then defend the Pawlak affidavits in two ways. Plaintiffs argue that "Mr. Pawlak is not a fact-based witness and does not know or possess discoverable information. His affidavits have been submitted for the purpose of reviewing and summarizing voluminous admissible, business records. Although the Government argues Mr. Pawlak should have been identified as an expert witness, it has failed to cite a single paragraph in his affidavits in which Mr. Pawlak has rendered any expert opinion. Because Mr. Pawlak is neither an expert nor an individual likely to have discoverable information, Plaintiffs had no duty under Rule 26 to disclose his name."

12

(*Id.* at 15.)  Plaintiffs also cite case law from this District and other courts that have allowed

summaries based on a personal review of financial or other records.

Rule 56(c)(1) allows parties to support their arguments for summary judgment by citing to

materials in the record including "documents" and "other materials."  FRCP 56(c)(1).  The opposing

party may challenge the materials cited.  "A party may object that the material cited to support or

dispute a fact cannot be presented in a form that would be admissible in evidence."  FRCP 56(c)(2).

The key phrase in the objection provision is the phrase "cannot be."  The provision does not say

"has not been," which would suggest that a party using the materials must present them at the

summary-judgment stage exactly as they would be admitted at trial.  "Cannot be," combined with

the conditional phrase "would be," indicates instead that materials can be considered at the

summary-judgment stage as long as courts find some reasonable possibility that the materials can be

cleaned up at trial to remove any evidentiary infirmities.  "We do not mean that the nonmoving

party must produce evidence in a form that would be admissible at trial in order to avoid summary

judgment.  Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses.

Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of

evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this

list that one would normally expect the nonmoving party to make the showing to which we have

referred."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *accord, e.g.*, *Miller v. City of New London*, No.

3:13-CV-619 VAB, 2015 WL 2240269, at *15 (D. Conn. May 12, 2015) ("First, while a party may, on

summary judgment, 'object that the material cited to support or dispute a fact cannot be presented

in a form that would be admissible in evidence,' Fed. R. Civ. P. 56(c)(2), this simply means that the

evidence must be capable of presentation in admissible form at the time of trial; it does not require

that the materials be presented in an admissible form on summary judgment.") (citing *Celotex*);

*Gordon v. Kaleida Health*, 299 F.R.D. 380, 393 (W.D.N.Y. 2014) ("This Rule simply provides that the evidence must be capable of presentation in admissible form at the time of trial; it does not require that the materials be presented in an admissible form on summary judgment."). With this understanding in mind, the Court has reviewed and considered the business records that plaintiffs have submitted. For the most part, the records appear to be photo copies of checks, invoices, and other documents generated in the ordinary course of business and not in anticipation of any litigation. The records likely would not be admitted at trial exactly as they are now, and without any additional context or testimony. Nonetheless, there would appear to be a reasonable possibility that the records can be authenticated, certified, and stripped of any annotations as needed to make them admissible at trial.

As for the Pawlak affidavits, the Court also sees no reason to disregard them for summary judgment purposes. Pawlak took care to explain that he was submitting his first affidavit only "to assist the Court with the mathematical calculations relating to: (1) the business revenue received by Alice Perkins in 2010, (2) the breakdown between income that both parties agree is taxable and the income generated from the sale of sand, gravel and fill sold by Alice Perkins from a gravel pit located on the Seneca Nation territory, (3) the expenses incurred by Alice Perkins in her business, and (4) the allocation of expenses relating to taxable income and non-taxable income." (Dkt. 61-4 at 6.) Several times, Pawlak uses the phrase "we have accepted as true" or "we have been instructed" to make clear that he was simply running numbers based on other people's stipulations or assumptions. Pawlak summarized the business records by concluding that, if plaintiffs' records were authentic, and if the Court found the gravel sales to be tax-exempt, then a tabulation of the business records would lead to total business expenses exceeding income in 2010 by $33,569. (Dkt. No. 69 at 2.) The Court considers that tabulation to be more of a hypothetical response to various

14

preconditions than an expert opinion that Pawlak generated himself.  Under Rule 56(c)(1), then, the

Pawlak affidavits are "other materials" that can help show a genuine dispute over material facts

without proving any of the facts themselves.  In that sense, defendant's "argument is not actually an

attack on the admissibility of the affidavits, but rather the weight to be given to them."  *Super Express

USA Publ'g Corp. v. Spring Publ'g Corp.*, No. 13-CV-2814 (DLI)(JO), 2017 WL 1274058, at *6

(E.D.N.Y. Mar. 24, 2017); *see also Ferrari Club of Am., Inc. v. Bourdage*, No. 6:12-CV-06530 EAW, 2017

WL 1498080, at *6 (W.D.N.Y. Apr. 25, 2017) ("On the personal knowledge front, courts have

found that personal knowledge of the records themselves is sufficient to testify as a summary

witness.") (citations omitted).

Whether the business records and the Pawlak tabulations ultimately are admitted at trial are

another matter that Judge Vilardo can consider at another time.  For now, the documents are

adequate materials for purposes of Rule 56.  The Court consequently recommends denying

defendant's motion to strike.

### B.  *Summary judgment generally*

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP

56(a).  "As to materiality, the substantive law will identify which facts are material.  Only disputes

over facts that might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment . . . . More important for present purposes, summary judgment will

not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986) (citation omitted).  "The party seeking summary judgment has the burden to

demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of

material fact exists, a court must examine the evidence in the light most favorable to, and draw all

inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence

in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*

*Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

The standard for summary judgment does not change when both sides file cross-motions

seeking the same relief. "When each side has moved for summary judgment, the district court in

entertaining the motions—and the court of appeals in reviewing the district court's decisions—are

required to assess each motion on its own merits and to view the evidence in the light most

favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party."

*Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir.

2011) (citations omitted). "[W]hen both sides move for summary judgment, neither side is barred

from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of

law, against it. When faced with cross-motions for summary judgment, a district court is not

required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*,

996 F.2d 1455, 1461 (2d Cir. 1993) (citation omitted).

### C. General canons of construction of Indian law

The Court addressed canons of construction in its Report and Recommendation of January

27, 2017 (Dkt. No. 14), but a brief review is helpful. Both the Sixteenth Amendment and the

Internal Revenue Code start with the premise that all individuals, including Indians, are subject to

the income tax unless an exemption applies. *See* 26 U.S.C. §§ 1, 61. "Indians are citizens and [] in

ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the

payment of income taxes as are other citizens." *Squire v. Capoeman*, 351 U.S. 1, 6 (1956). Sometimes,

though, Indian affairs are governed by treaties, and

> The language used in treaties with the Indians should never be construed to their prejudice.  If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense . . . . How the words of the treaty were understood . . ., rather than their critical meaning, should form the rule of construction.

*Worcester v. Georgia*, 31 U.S. 515, 582 (1832), *abrogated in part on other grounds by Nevada v. Hicks*, 533 U.S. 353, 361 (2001).  When treaty language potentially creates an income-tax exemption, "[t]he intent to exclude must be definitely expressed, where, as here, the general language of the act laying the tax is broad enough to include the subject-matter."  *Choteau v. Burnet*, 283 U.S. 691, 697 (1931).  The Ninth Circuit has provided a concise summary of the standard that plaintiffs have to satisfy:

> The applicability of a federal tax to Indians depends on whether express exemptive language exists within the text of the statute or treaty.  The language need not explicitly state that Indians are exempt from the specific tax at issue; it must only provide evidence of the federal government's intent to exempt Indians from taxation.  Treaty language such as "free from incumbrance," "free from taxation," and "free from fees," are but some examples of express exemptive language required to find Indians exempt from federal tax.  Only if express exemptive language is found in the text of the statute or treaty should the court determine if the exemption applies to the tax at issue.

*Ramsey v. United States*, 302 F.3d 1074, 1078–79 (9th Cir. 2002); *see also Holt v. C.I.R.*, 364 F.2d 38, 40 (8th Cir. 1966) ("Courts have recognized that treaties and statute[s] relating to the right of noncompetent Indians should be liberally construed in favor of Indians.  However, such principle comes into play only if such statute or treaty contains language which can reasonably be construed to confer income exemptions.") (citations omitted).

As long as any treaty in question contains the minimum necessary language, any ambiguities in the details are resolved in favor of the Indian individual or tribe.  *See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999) ("We have held that Indian treaties are to be interpreted liberally in favor of the Indians, and that any ambiguities are to be resolved in their favor.") (citations omitted); *Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226,

247 (1985) ("The canons of construction applicable in Indian law are rooted in the unique trust

relationship between the United States and the Indians.  Thus, it is well established that treaties

should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their

benefit.  Absent explicit statutory language, this Court accordingly has refused to find that Congress

has abrogated Indian treaty rights.") (internal quotation marks and citations omitted).  That said,

though, "even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a

claimed injustice or to achieve the asserted understanding of the parties."  *Choctaw Nation of Indians v.*

*United States*, 318 U.S. 423, 432 (1943) (citations omitted).

### D.  General applicability of the Canandaigua and 1842 Treaties

The parties have expended some effort arguing again whether the Canandaigua Treaty and

the 1842 Treaty provide plaintiffs with a legally cognizable claim.  (Dkt. No. 60-1 at 7–13; Dkt. No.

62 at 7–17.)  Judge Vilardo already said yes (Dkt. No. 24), and this Court sees no reason to

recommend revisiting Judge Vilardo's analysis.  Defendant has made clear that it strenuously

disagrees with Judge Vilardo's interpretation of the treaties in question.  This Court certainly

respects defendant's desire to argue zealously for an interpretation of the treaties that is most

favorable to the IRS.  (*See* Dkt. No. 53 at 5 ("As part of regular zealous advocacy, *of course* each side

would love to have a stay of the case in which it received an unfavorable legal ruling.").)

Nonetheless, when defendant argues that the law of the case "doctrine is not an inviolate rule in this

Circuit, and merely expresses the general practice of refusing to reopen what has been decided"

(Dkt. No. 71 at 13 (internal quotation marks and citations omitted)), the Court is left with a sense

that, in defendant's view, nothing that Judge Vilardo does is binding on the Tax Court, while

anything that the Tax Court does is binding here.  This view is not persuasive.  As the Court has

noted before, plaintiffs have the right to pursue this case as independent litigation, and one way or

another, the parties will appear before the Second Circuit soon enough.  The Court is content to

leave the issue there.

### E.  *Applicability of the treaties here*

Although Judge Vilardo has decided that the Canandaigua and 1842 Treaties potentially

recognize plaintiffs' claims, he made his decision in the context of Rule 12.  There is a difference

between accepting the pleadings as true and deciding whether to dismiss; and examining the results

of discovery to determine the limits of a reasonable jury's actions:

> The Court currently knows nothing about why Alice wanted to extract gravel, why
> the Seneca Nation gave her permission to do so, how Alice sold the gravel, or how
> much she sold.  Did Alice sell the gravel in front of her house the way some people
> cut their own timber from their backyards and sell firewood on the  shoulder of the
> road in front of their houses?  Did Alice sell gravel through a commercial entity that
> did other things much less connected to Seneca land?  Some of these details might
> matter; some might not.  Potentially, though, plaintiffs will be able to present a
> scenario in which a fairly modest amount of income came so directly from Seneca
> land that, in a sense, they were selling a part of the physical land itself.

(Dkt. No. 14 at 12) (citation omitted).  The Court now has to assess whether plaintiffs in fact have

presented a scenario that places them under the protection of the treaties that they have invoked.

A few similar or analogous situations offer some guidance as to the type of connection

needed between Indian land and income generated.  For cases falling under the IGAA, the Court

draws guidance from the occurrence of the tax exemptions in themselves.  The IGAA obviously sets

forth the very different statutory scheme than any particular treaty does, but even cases under that

statute can demonstrate that certain exemptions are not unheard-of under the right factual and legal

circumstances.  With respect to particular examples, "income realized by an Indian landholder in the

operation of a motel, a restaurant, gift shop, and from building rentals, is not income directly derived

from the land and is not immune from federal income tax simply because the businesses and

buildings are physically located on tax-exempt reservation land."  *Critzer v. United States*, 597 F.2d

708, 714 (1979); *accord Dillon v. United States*, 792 F.2d 849, 856 (9th Cir. 1986) ("The tax exemption

must be denied here under the *Capoeman* rule because the smokeshop income was not generated

principally from the use of reservation land and resources.  Instead, the income here was earned

primarily through a combination of taxpayers' labor, the sale of goods produced off the reservation

and improvements constructed on the trust land.  This income is more akin to 'reinvestment'

income than income 'derived directly from the land and is taxable.").  Income generated by farming

assigned Indian land is exempt; dividends from a casino built upon previously farmed land are not, if

they were not received in lieu of farming income.  *See Campbell v. Comm'r*, 164 F.3d 1140, 1141, 1142

(8th Cir. 1999).  Cattle and ranching operations have been held to generate taxable income, but

where the IGAA applied and where no treaty directed otherwise.  *See Holt v. Comm'r*, 364 F.2d 38, 41

(8th Cir. 1966).  Tax exemptions related to mineral rights are not unknown.  In a case involving an

oil and gas lease on allotted land, income related to the lease was considered exempt based on the

express language of a statute, other than the IGAA, that functioned like a treaty.  *Cf. United States v.*

*Daney*, 370 F.2d 791, 795 (10th Cir. 1966).  Rental income from an apartment complex is taxable, but

if the IGAA or appropriate treaty language applies then "income derived from the rental of trust

land itself or the exploitation of natural resources thereon, including most agricultural uses, is tax-

exempt."  *Beck v. Comm'r*, 64 F.3d 655, No. 94-2311, 1995 WL 508884, at *5–6 (4th Cir. Aug. 29,

1995) (table case).  Under the right circumstances, royalty income from mineral rights can be tax-

exempt.  *See Big Eagle v. United States*, 300 F.2d 765, 772 (Ct. Cl. 1962).  Income from timber sales is

derived directly from Indian land.  *See Kirschling v. United States*, 746 F.2d 512, 515 (9th Cir. 1984).

Similarly, income from the sale of chats[6] found on Indian land is not taxable.  *See United States v. Hallam*, 304 F.2d 620, 621 (10th Cir. 1962).

The examples that the Court has reviewed in the cases cited above persuade it that a tax exemption should apply here.  The product that generated income for plaintiffs was not a retail product, like cigarettes or gasoline, that was brought to Seneca Nation land.  The product also was not a commercial improvement on land like an apartment complex.  The product in question was gravel, a material that the Supreme Court has considered a mineral in at least some legal contexts. *See Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 55 (1983).  At all times relevant to this case, plaintiffs extracted their gravel directly from land that belongs to the Seneca Nation.  Plaintiffs had to reach agreements with Alton Jimerson and the Seneca Nation before extracting the gravel, but these agreements do not change the origin of the gravel.  Defendant notes correctly that plaintiffs literally did not extract the gravel with their own hands, choosing instead to hire an employee to conduct the extraction through a business entity.  The Court finds that distinction unavailing for two reasons. First, the business entity in question was a small sole proprietorship that left plaintiffs exposed to unlimited liability.  Second, the Court has to be careful about lapsing into unconscious stereotypes of Indian activities that occur on Seneca Nation land.   In 1794 and 1842, the dates of the treaties in question, industrialization was in its infancy compared to where it is now.  Some commercial activities would have been known, but the signatories to the treaties in question likely would have had little concept of "free use and enjoyment of land" beyond subsistence living or other personal uses.  Nonetheless, a concept in statutory or contractual language can include later technological changes that do not alter the essence of the concept.  *See, e.g., Morrison-Knudsen Const. Co. v. Dir., Office*

---

[6] A "chat" appears to be a nonspecific term for songbirds in the taxonomic subfamily *Saxicolinae.  See, e.g.*, Chat (bird), https://en.wikipedia.org/wiki/Chat_(bird) (last visited July 24, 2018); Yellow-breasted Chat, https://www.allaboutbirds.org/guide/Yellow-breasted_Chat (last visited July 24, 2018).

*of Workers' Comp. Programs, U.S. Dep't of Labor*, 461 U.S. 624, 638 (1983) ("Legislative enactments framed in general terms and designed for prospective operation should be construed to apply to subjects falling within their general purview even though coming into existence after their passage."); *Cain v. Bowlby*, 114 F.2d 519, 522 (10th Cir. 1940) ("And it is a general rule in the construction of statutes that legislative enactments in general and comprehensive terms, and prospective in operation, apply to persons, subjects and businesses within their general purview and scope, though coming into existence after their passage, where the language fairly includes them.") (citations omitted); *accord Standard Electrica, S. A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft*, 375 F.2d 943, 946 (2d Cir. 1967).  In the world outside Indian reservations, for example, large corporations have drastically altered the scope of farming through the use of automated machinery, massive irrigation systems, and scientific testing of soil.  The dramatic technological changes in farming, though, have not changed the fundamental concept of sowing seeds and reaping the fruit of the harvest.  So it goes with Indian enterprises.  If the treaties in question allow for the free use and enjoyment of Seneca Nation land then that free use and enjoyment should not be limited by the changes in technology that spared plaintiffs from having to extract gravel themselves by hand.  *See* Raymond J. Fadel, *An Indian by Any Other Name: Cross-Border Affirmative Action*, 92 N.Y.U. L. Rev. 1107, 1126 (2017) ("Contemporary Indians face two kinds of stereotypes relative to 'tribe-like' behavior: Either they are 'full bloods' who wear traditional dress, are one with nature, and live an exclusively subsistence lifestyle, or—if engaged in mainstream economic activity—their tribes are seen as only groups of racially-related opportunists who use the system to get an unfair edge over non-Indian competition."); Renee Ann Cramer, *The Common Sense of Anti-Indian Racism: Reactions to Mashantucket Pequot Success in Gaming and Acknowledgment*, 31 Law & Soc. Inquiry 313, 332 (2006) ("Even friendly journalistic accounts of the Mashantucket Pequot's success invariably make

distinctions between them and other Indians in ways that impugn their authenticity as Indians, reinforce stereotypes about what 'authentic Indians' are, and equate indigeneity with primitivism and poverty.").  Only a harsh and limiting stereotype would require plaintiffs to extract gravel as they would have in 1794 or 1842, to avail themselves of a tax exemption.  There might be some outer limit beyond which the size and complexity of plaintiffs' enterprise might jeopardize their tax exemption.  The Court need not determine that outer limit here; for this case, the Court can stop at the conclusion that plaintiffs have not exceeded any outer limit that might exist.

The Court thus concludes that the Canandaigua Treaty and the Treaty of 1842 fully cover the scenario that plaintiffs have presented here.

### F.  Plaintiffs' business income and defendant's affirmative defense

Although the Court has concluded that plaintiffs fall fully under the two treaties in question, the protection of the treaties is not the end of the story.  Plaintiffs are not seeking a declaratory judgment about the treaties; they are seeking a refund of income tax that they paid in 2010.  The treaties are simply a means to that end.  At the same time, defendant's fifth affirmative defense addresses the ultimate issue of whether plaintiffs in 2010 paid more tax than they owed—an issue affected by the treaty issue but not the same as the treaty issue.  Summary judgment, then, hinges on what a reasonable jury could do when reviewing the materials in the record.

After reviewing the parties' motion papers and considering all the materials in the record, the Court finds a number of questions of fact that should await trial.  Some of the checks and invoices linked to individual transactions do not make clear what the particular transaction in question was. *Cf. Winmar Co. v. Teachers Ins. & Annuity Ass'n of Am.*, 870 F. Supp. 524, 539 (S.D.N.Y. 1994) (question of fact regarding proper calculation of real estate taxes).  Additionally, while plaintiffs have attempted various summaries of their business expenses, the original documents purporting to show

payroll expenses include highlighted line items where neither the highlighting nor the line item is readily understandable. (*See, e.g.*, Dkt. No. 61-2 at 141, 145.) These payroll expenses are also difficult to understand in light of the possibly incomplete separation of gravel and non-gravel labor that the Court explains below. In another example, plaintiffs have submitted numerous documents that appear to show expenses that they incurred for business equipment. Handwritten annotations such as "loader in pit" appear to be an attempt to indicate when plaintiffs incurred a particular business expense related to extraction of gravel. (*See, e.g.*, Dkt. No. 61-3 at 15.) For purposes of assessing summary judgment, these invoices are enough to show that a reasonable jury could hear testimony from plaintiffs and credit any claim that the expenses incurred never went toward taxable purposes. Credibility, however, is for the jury to decide. *See Lendino v. Trans Union Credit Info. Co.*, 970 F.2d 1110, 1113 (2d Cir. 1992) ("Summary judgment may be utilized as an effective tool to avoid plenary trials where there exists no reasonable possibility that a jury may render a verdict for the nonmovant. Summary judgment should not be used, however, where credibility issues remain on disputes of material fact even though those disputes concern the inferences which may be drawn from indirect proofs."). The same goes for the numerous checks that plaintiffs have submitted to substantiate, item for item, each of the actual gravel purchases made that went toward exempt income in 2010. (*See generally, e.g.*, Dkt. No. 64.) *Cf. Schulz v. United States*, No. 115CV01299BKSCFH, 2018 WL 3405240, at *5 (N.D.N.Y. July 12, 2018) (question of fact regarding gross income, for purposes of determining a tax shelter penalty). These checks seem reasonably capable of being submitted in admissible form at trial, and they show for now that a reasonable jury could review the checks, listen to plaintiffs or even some former gravel customers, and agree that tax-exempt gravel purchases actually occurred as indicated in the checks and other documents. *Cf. Chang Mei Lin v. Yeh's Bakery, Inc.*, No. 12-CV-2146 JG, 2013 WL 867436, at *3

24

(E.D.N.Y. Mar. 7, 2013) (question of fact regarding a restaurant's gross income for Fair Labor

Standards Act purposes); *Monterossa v. Martinez Rest. Corp.*, No. 11 CIV. 3689 JMF, 2012 WL

3890212, at *4 (S.D.N.Y. Sept. 7, 2012) (question of fact regarding a restaurant's gross income for

Fair Labor Standards Act purposes, based on documents and testimony, even if the "testimony may

be self-serving or otherwise inaccurate").  In the face of other ambiguities in the case, however,

giving the documents full credit right now would require assigning a level of weight and credibility

that is inappropriate at the summary-judgment stage.

In this context, the Court can go only as far as to say that the materials in the record appear

to be sufficiently reliable that they should go to a factfinder for further review.  As for the numbers

themselves, questions of fact remain as to how Alice and her tax preparer interacted with each other

for mathematical tabulations, and as to who relied on whom for summary information of the raw

numbers:

> Q. And sort of a broader question about Page 16 of 33 reflects some expenses of
> A&F Trucking.  Do you remember how you provided the information to
> your tax preparer to report your expenses for A&F?
>
> A. I total them up and have him come in and then he was able to—he could either
> take the files if he wanted them so it wasn't just my word and so what he did
> with my figures, I don't even know if he used my figures, if he took my stuff
> with him.
>
> Q. You said you totaled them up.  Did you present them a certain way as a summary
> for him?
>
> A. Usually I did.  Usually I did.  Because otherwise he would have to open each one
> individually and do it, so I would do a little summary that he gave me the first
> year and then each year I try to copy that same one.

(Dkt. No. 60-5 at 33.)  *Cf. Ins. Co. of State of Pa. v. J.L. Kelley, Inc.*, 612 F. Supp. 1196, 1197 (S.D.N.Y.

1985) (question of fact surrounding accounting methods deemed "typical practice" in the

reinsurance industry).  The source of any summary information also appears to come with questions

better left in the hands of a jury:

> Q. I just gave to you what I marked as Defendant's Exhibit 21.  Do you recognize
>    that document?
>
> A. I have seen it.  I have seen this.  I found it in my—it was in the—I believe the file
>    folder with my supplies rather than in with my income taxes stuff that I get
>    back from Joe with my 1099s and all that.
>
> Q. So this is a document that you had maintained over a number of years or that
>    were at least in your files?
>
> A. It looks different than what—because my list I thought were a little bit longer and
>    had other things in it.  I don't know if my daughter did this.  I know I didn't
>    come up with this form of this one because it just looks different.
>
> Q. Do you remember if this is something you prepared?
>
> A. I personally myself did not prepare it.
>
> Q. And do you know how this came to be created?
>
> A. I'm not 100 percent sure.
>
> Q. Can you tell what it is even if you didn't prepare it?
>
> A. It looks like a thing that you would use to do an income tax maybe.  It has like
>    stuff that would be expenses.
>
> Q. But as you sit here today, you do not have any memory if you gave this to Ellis
>    Tax Service to help prepare your tax returns?
>
> A. I don't know if I gave him this one.  Like I said, this one just looks a little
>    different.  I don't know whether Joe did it himself because it wasn't in where
>    it always would be, which would have been right in with the 1099s.  It would
>    have went with him with the 1099s and I found this in the supplies, so I
>    don't know.
>
> Q. Do you remember if you prepared some sort of spreadsheet in 2010 for your tax
>    return preparation?
>
> A. I don't because I don't think I ever prepared any of them.  My daughter would
>    have.

(Dkt. No. 60-5 at 36.)  These questions arise even before the biggest question that a jury will have to

review—namely, the discrepancy that plaintiffs have acknowledged regarding their 2010 gross

taxable income.  The Court is not criticizing plaintiffs when it points out that, once before in 2010,

plaintiffs believed that they reviewed all of their business documents and calculated gross taxable

income accurately.  They were wrong—not necessarily in any malicious way, but wrong nonetheless.

That the parties appear unable to agree on a single figure for 2010 gross taxable income suggests to

the Court that no number of accountants and raw documents can completely eliminate the

discretionary judgments that went into preparation of plaintiffs' 2010 tax return.  *Cf. Six v. United*

*States*, 300 F. Supp. 277, 280 (S.D.N.Y. 1969) (finding questions of fact concerning deductible

expenses that might establish a refund).  Another example of a discretionary judgment concerns the

exact breakdown of employee wages and labor devoted only to gravel sales compared to other

activities:

> Q. Do you remember if you separated the wages you told your tax preparer about
> into people who worked on gravel sales or time devoted to gravel sales and
> time devoted to non gravel sales work?
>
> A. Again, I thought Joe was doing what he was supposed to do.  I just assumed that
> that's why I hired him.
>
> Q. Did you particularly provide him a breakdown like that when he—for him to do
> his work?
>
> A. He never asked me for it.
>
> Q. And so that wasn't provided to him?
>
> A. Because he never asked for it.  Like I said, in the beginning he was the one that
> brought this whole thing [*i.e.*, treaty-based tax exemption] to my attention.  I
> assumed he was doing what needed to be done.

(Dkt. No. 60-5 at 38.)  As one final example, even though plaintiffs have emphasized that they hired

an employee specifically to work at the gravel pit, they are not completely certain that gravel and

non-gravel labor and wages can break down that cleanly:

Q. The other I guess—you said there were seven employees.  In 2010 did their work
    involve in some way the sale of gravel?  Were they called upon to deliver
    gravel to customers?

A. They might have.  I wouldn't know without looking at an invoice.

Q. I guess I can ask it more broadly.  Did you separate out tasks for A&F between
    oh, this is my gravel work and this is everything else or were they just A&F
    employees who did whatever they were called upon to do?

A. Yeah, employees that were called upon to do whatever they were supposed to do.
    The ideal job for them is to have them out working for somebody else,
    getting an hourly rate rather than working for me.  A lot of these companies
    want to come get their own anyway and that would work better for us
    because it didn't tie our trucks up.

Q. And you mean coming in and actually picking up the gravel?

A. Yes.

(Dkt. No. 60-5 at 50.)  Any incomplete separation of gravel and non-gravel labor expenses would

undermine the highlighting that plaintiffs have submitted in some of their payroll documentation.

(*See, e.g.*, Dkt. No. 61-2 at 205 (highlighting payroll expenses only for Greg Vanderwege).)  *Cf.*

*Gunawan v. Sake Sushi Rest.*, No. 09 CV 5018 ALC, 2011 WL 3841420, at *4 (E.D.N.Y. Aug. 26,

2011) ("In any event, the issue of wages paid for hours worked is essentially one of credibility, and

for that reason it is inappropriate for resolution at the summary judgment stage.") (citations

omitted).  Plaintiffs implicitly concede the presence of ambiguities when they themselves refer to

"summarizing and calculating Alice's net taxable income, *if any*."  (Dkt. No. 62 at 20 (emphasis

added).)  A factfinder will be in a better position to review any discretion used.

The analysis that the Court just explained above applies equally to both sides' motions, but

the Court will take a moment to address defendant's motion specifically.  As noted above, defendant

in its answer to the amended complaint asserted affirmative defenses including a fifth affirmative

defense of offset.  The core of the fifth affirmative defense is the accounting irregularity that

plaintiffs admitted during discovery; namely, that plaintiffs underreported income and overreported expenses for the 2010 tax year.  In defendant's words,

> Plaintiffs' refund claim fails for a more basic reason.  Plaintiffs appear to concede that they inadvertently under-reported the gross receipts for A & F Trucking on their 2010 income tax return.  (¶ 67.)  A & F Trucking's total income in 2010 actually amounted to over $950,000—not the $711,457 they reported to the IRS.  (*Id.*)  Because Plaintiffs under-reported their gross receipts by $240,785.92, they still would not be entitled to a refund even if they succeed on their claim that $184,552 of gravel income was tax exempt.  That is, even if Plaintiffs' gravel income was non-taxable under the theory they propose, they have failed to establish that they overpaid the amount they actually owed to the IRS for 2010.  Thus, they cannot prevail in a refund case.

(Dkt. No. 60-1 at 39.)

In response, Alice has submitted with her own affidavit a spreadsheet that summarizes the income that she received from customers in 2010 for gravel and non-gravel business.  (Dkt. No. 61-2 at 94–111.)  Through her affidavit, Alice is asserting $177,108.16 of gravel-related income in 2010. (*Id.* at 111.)  Alice has included with her spreadsheet numerous pages of canceled checks and invoices that purportedly substantiate each line item in the spreadsheet.  (*See generally* Dkt. Nos. 63– 69.)  Even in the absence of expert testimony, Alice's documentation suffices to demonstrate that the parties have a genuine and material dispute about which individual business transactions should be tax-exempt and how Alice's tax liability should be calculated for the year 2010.  Alice has provided additional information solidifying the Court's sense that the exact computation of plaintiffs' 2010 tax cannot be resolved as a matter of law.  Alice has suggested in her affidavit that some questions surround the treatment of customer checks received in one calendar year but deposited in a different calendar year.  (*See* Dkt. No. 61-2 at 15 ("My attorneys have advised me checks received in 2009, but deposited in 2010, must be reported as 2009 revenue.  Similarly, checks deposited in 2011, but received in 2010 should be accounted as 2010 revenue.").)  Alice has indicated that her relationships with at least some customers raises questions of fact about her

29

treatment of accounts receivable and whether those accounts receivable affect her tax calculations. (*See id.* at 17 ("Barbara Clark and her husband operated a business installing driveways. The Clarks always picked-up gravel at the Gravel Pit and later were sent an invoice based on the ticket showing the tonnage purchased on credit. The Clarks first were good credit customers, but their account became delinquent shortly before they went out of business. There is still a considerable balance due on this account. This was the last payment received and was only received because I threatened to turn their account over for collection.").) Additionally, Alice has explained that some irregularities in her record-keeping might have caused her to underestimate the amount of business income that is tax-exempt, a matter that would be better left to a jury to resolve. (*See id.* at 18 ("I do not have any customer invoices for these customers. Although these pit customers would occasionally pick-up and pay for gravel at the pit, they would also have sand/gravel delivered or would purchase other material, like topsoil. Because I do not recall and cannot prove the amount that would have been paid for gravel sales, we have included the full amount deposited on these checks as taxable income."); *id.* at 20 ("Some of receipts had faded and were illegible, or were missing. In such cases, we relied upon the identity of the vendor and our knowledge of the services, products, and materials provided by the vendor to determine whether the expenses could be allocated between taxable and exempt business activities. When we could not identify whether an expense could be allocated or deducted, then we took a conservative approach by not seeking a deduction.").) Finally, Alice has submitted evidence with her affidavit that she had business expenses related to labor, materials, and supplies, though her exact process of allocation is a matter better suited for a jury to review:

> In allocating expenses, we have first looked to a method as to how the expense related to a taxable activity. For example, if the expense related to employee labor, then we removed the expense related to Mr. Vanderwege's labor in the Gravel Pit. Wages paid to employees who labored outside of the pit was 83.2% of all wages

> paid. (*See* Exhibits S, T, *infra*). If the expense, however, related to materials and
> supplies, we tried to separate those materials and supplies used outside of the pit
> from those used in the pit. If the expense could not be separated by the methods
> described above, then the allocation was made based on the percentage of revenue
> attribute to taxable income (*i.e.* 80.74%).

(*Id.* at 25.) IRS Agent Elizabeth Nix has offered some confirmation of the Court's sense that

determining plaintiffs' actual numbers for 2010 will require the jury to do a considerable amount of

careful analysis:

> I did not conduct a full examination of Taxpayers' 2010 income tax return.
> For example, I did not examine their 2010 income or business expenses, and did not
> request or review any receipts, statements, workpapers, or other records of A & F
> Trucking for that year. I did not conduct a bank analysis to determine Taxpayers'
> 2010 gross receipts.
>
> In order to conduct an examination of a taxpayer's income and expenses,
> IRS Revenue Agents do not just sift through piles of receipts and invoices and
> prepare a fresh income tax return. We are required to tie the documents provided by
> a taxpayer to the entries on his or her tax return and then determine which entries
> are substantiated. We then explain our proposed adjustments to the taxpayer before
> the IRS assesses additional tax.

(Dkt. No. 71-3 at 6–7.)

Under these circumstances, and after reviewing the business records in question, the Court

concludes that genuine questions of material fact surround defendant's fifth affirmative defense and

Alice's response that her business deductions exceeded her taxable income in 2010. Since both sides

properly submitted a jury demand (Dkt. Nos. 7, 46), the ultimate outcome of plaintiffs' efforts to

obtain a refund will have to await trial.

## IV.   CONCLUSION

Plaintiffs are entitled to an exemption from income tax for income derived from gravel

extracted and sold from Seneca Nation land. The problem is, while everyone knows that gravel sales

happened, no one seems to know exactly how much tax-exempt gravel income plaintiffs generated.

Also, no one seems to know exactly what expenses plaintiffs might have incurred in the process of

generating that income.  Finally, no one seems to be able to agree on a definitive method for accounting for the income and expenses.

That some gravel sales occurred and would be tax-exempt is enough to say that plaintiffs' principal claim, and defendant's affirmative defenses including the fifth affirmative defense, must await ultimate resolution at trial.  A jury will simply have to sort out the details.  For all of the above reasons, the Court respectfully recommends denying both pending motions for summary judgment along with defendant's motion to strike (Dkt. Nos. 60, 61, 70).

## V.  OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  FRCP 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted).  "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object.  The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation

we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record.  Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review.  Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

___/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: July 24, 2018