UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
——————————————————————X
                                           :
FREDRICK PERKINS and                       :
ALICE J. PERKINS,                          :
                                           :
    *Plaintiffs,*                         :   No. 1:16-cv-00495-LJV
                                           :
    *v.*                                   :
                                           :
UNITED STATES OF AMERICA,                  :
                                           :
    *Defendant.*                           :
——————————————————————X

**OBJECTION TO THE REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Defendant United States of America submits the following objection to the Report and Recommendation of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1).

Introduction

On July 24, 2018, United States Magistrate Judge Hugh B. Scott issued a Report and Recommendation urging the Court to deny both parties' motions for summary judgment and to deny the United States' motion to strike.  *See* Doc. No. 84.  The United States objects to all portions of the Report and Recommendation related to (1) the conclusion that questions of fact preclude summary judgment in favor of the United States on the issue of whether plaintiffs paid more tax than they owed in 2010; and (2) the conclusion that the Plaintiffs' gravel-related income is tax exempt because "the Canandaigua Treaty and the Treaty of 1842 fully cover the scenario that plaintiffs have presented here[,]" Doc. No. 84 at 23.  The United States also objects to all portions of the Report and Recommendation related to the recommendation that the Court deny the United States' motion to strike, which would permit consideration of Plaintiffs'

unauthenticated hearsay documents and the improper declaration of an incompetent and previously-undisclosed witness, John Pawlak.

The United States respectfully requests that the Court, after conducting its *de novo* review of those portions of the Report and Recommendation, grant the United States' summary judgment motion and dismiss this lawsuit, since the undisputed facts establish that Plaintiffs' taxable income exceeded their deductible business expenses in 2010, and their gravel-related income was not tax exempt.

Plaintiffs Are Not Entitled to a Refund

Initially, the United States objects to the recommendation to deny summary judgment, because the undisputed facts show that Plaintiffs under-reported their income for 2010, resulting in their paying less tax than was legally due even if they prevail on their theory of tax exemption. No matter the taxability of Plaintiffs' gravel income, Plaintiffs are not entitled to a refund – their taxable income in 2010 undoubtedly exceeded their deductible business expenses. The recommendation to deny summary judgment on this basis (raised by the United States at Doc. No. 60-1 at 12-13 & 39-42 and partially addressed in Section III(F) of the Report and Recommendation) is erroneous.

The United States has waived sovereign immunity for suits seeking the refund of taxes "erroneously or illegally assessed or collected." 26 U.S.C. § 1346(a)(1). However, a taxpayer is not entitled to a refund unless he affirmatively establishes that he has overpaid his tax. *See Lewis v. Reynolds*, 284 U.S. 281, 283 (1932). An "action to recover on a claim for refund is in the nature of an action for money had and received and it is incumbent upon the claimant to show that the United States has money which belongs to him." *Id.*; *see also Cuba R. Co. v. United States*, 254 F.2d 280, 282 (2d Cir. 1958) ("when a taxpayer seeks a refund for a credit mistakenly

denied, he must be content to allow his tax for the same year to be corrected because of errors through which he has profited"). There is no case or controversy where a plaintiff is correct about the legal issue for which she sues, but can establish no resulting damages. *Lewis*, 284 U.S. at 283. That is, Plaintiffs cannot obtain an advisory opinion establishing that some of their income is tax exempt where they cannot prevail on the primary issue of whether they are due a tax refund. *See United States v. Janis*, 428 U.S. 433, 440 (1976) ("It is not enough for him to demonstrate that the assessment of the tax for which refund is sought was erroneous in some respects.")

In order to establish jurisdiction for a refund claim, a taxpayer first must file an administrative claim for refund or credit with the IRS setting forth in detail *each* ground upon which a credit or refund is claimed, and facts sufficient to apprise the IRS Commissioner of the exact basis thereof. 26 U.S.C. § 7422(a); *see also* 26 C.F.R. § 301.6402-2(b). The "variance doctrine" bars a taxpayer from raising as a basis for tax refund any issue that was not first raised in her administrative claim with the IRS. *See, e.g., Angelus Milling Co. v. Commissioner,* 325 U.S. 293, 296 (1945); *Magnone v. United States*, 902 F.2d 192, 193 (2d Cir. 1990); *Stern v. United States,* 949 F. Supp. 145, 149 (E.D.N.Y. 1996); *Krasnow v. United States*, 508 F. Supp. 1099, 1104 (S.D.N.Y. 1981). Because the failure to exhaust administrative claims is jurisdictional, it may be raised at any time. *See, e.g., Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see also* FED. R. CIV. P. 12(h)(3).

Here, the IRS assessed a total deficiency for 2010 of $9,863.68 in tax, penalties, and interest, based solely on Plaintiffs' failure to pay federal tax on their self-reported gravel income. *See* Doc. No. 61-1 at ¶¶ 20-21. Plaintiffs paid the assessed amount, and then submitted an administrative claim with the IRS asserting that their income derived from the sale of sand and

gravel was tax exempt, so they were entitled to a refund for 2010 of all $9,863.68.  *See* Doc. No. 61-1 at ¶¶ 20-23; *see also* Doc. No. 84 at 5.  Plaintiffs raised no other grounds for the Commissioner to consider.  *Id.*  Accordingly, Plaintiffs are not entitled to a tax refund for 2010 – and cannot overcome summary judgment – unless they can show that (1) their income from gravel sales was tax exempt; and (2) because of this alleged tax exemption alone, the United States retained money which belongs to them.  *See, e.g., Stern*, 949 F. Supp. at 146.  The undisputed facts show that Plaintiffs cannot and did not sustain this burden.  The recommendation to deny the United States' motion for summary judgment therefore was erroneous.

It is undisputed that Plaintiffs' 2010 gross income was at least $919,623,[1] including gravel-related earnings of $177,108.  *See* Doc. No. 72-1 at ¶ 67 & Doc. No. 61-2 at ¶ 94.  Even if their legal theory is correct, then, Plaintiffs are not entitled to a tax refund for 2010 – and cannot overcome summary judgment – unless their deductible business expenses exceeded $742,515.  Plaintiffs' 2010 tax return asserts deductible business expenses of $484,968.  *See* Doc. No. 60-13 at 10; *see also* Doc. No. 60-17 at 1; Doc. No. 84 at 7.  Thus, the undisputed summary judgment evidence shows that Plaintiffs' non-gravel income in 2010 exceeded their deductible business expenses by at least $257,547.  Plaintiffs are not due a refund even if they prevail on their theory of tax exemption.

---

[1] The United States contends that Plaintiffs' gross income in 2010 actually was $952,242.92, because they now have incorrectly omitted 23 checks that were deposited in 2010 but never reported on their 2009 or 2010 income tax returns.  *See* Doc. No. 60-1 at 21 & Doc. No. 71 at 22-24.  However, this factual dispute is immaterial to the United States' entitlement to summary judgment.

Plaintiffs did not cite record evidence or otherwise dispute that the United States' assertion that they are not entitled to a refund even under their own interpretation of the Canandaigua Treaty and the 1842 Treaty.[2]  *See* Doc. No. 72.  In Plaintiffs own motion for summary judgment, for the first time, they appear to claim entitlement to a refund because both (1) their gravel-related income was tax exempt; and (2) they have discovered an additional $291,116 of deductible business expenses for tax year 2010.[3]  *See* Doc. No. 61-4 at 10 & Doc. No. 62 at 17-20.  That is, Plaintiffs now seek a refund based on two grounds:  that their gravel income was tax exempt *and* that they incurred additional, unreported deductible business expenses in 2010.

However, Plaintiffs' administrative refund claim with the IRS only raised their alleged tax exemption for income derived from gravel sales.  *See* Doc. No. 61-1 at ¶¶ 20-23.  Plaintiffs plainly did not allege to the IRS that they were due a refund because their 2010 business expenses were underreported.  *See* Doc. No. 61-1 at ¶¶ 20-23 & Doc. No. 62 at 17-20.  The variance doctrine prohibits Plaintiffs from raising their new basis for refund in this Section 1346 action.  *See, e.g., Stern*, 949 F. Supp. 145, 149-50 (E.D.N.Y. 1996).  "The Commissioner of Internal Revenue is entitled to insist upon full compliance with this regulation, which affords the

---

[2] Plaintiffs only stated in conclusory fashion that "Plaintiffs have set forth sufficient evidentiary proof to prove they are entitled to a refund for income tax, interest, and penalties wrongfully collected by the Government in violation of these federal treaties and in violation of the Supremacy Clause of the United States Constitution."  Doc. No. 72 at 13.

[3] The United States Magistrate Judge cited factual disputes about these alleged business expenses in recommending denial of Plaintiffs' motion for summary judgment.  Doc. No. 84 at 23-31.

I.R.S. an opportunity to examine the facts and legal arguments that are central to a plaintiff's claim before coming to federal court." *Id*. at 149.

In sum, Plaintiffs are barred from obtaining a refund of alleged deductible business expenses, because those expenses were not raised in their administrative refund claim. Plaintiffs' failure to seek a refund based on the additional $291,116 in purported business expenses deprives the Court of jurisdiction to consider that issue here. And without deducting the additional business expenses, Plaintiffs' 2010 taxable income exceeded their deductible business expenses – no matter the taxability of their gravel-related income. Accordingly, Section III(F) of the Report and Recommendation is erroneous, and the United States' motion for summary judgment should be granted.

Plaintiffs' Gravel Income Is Not Tax Exempt

The United States has not waived sovereign immunity for a declaratory judgment in tax cases that a taxpayer *would otherwise* be entitled to a refund, so the Court need not issue a final determination on whether the Canandaigua Treaty or the 1842 Treaty bar federal taxes on Plaintiffs' gravel income. *See* Doc. No. 24 at 1. However, since the Report and Recommendation concludes that "the Canandaigua Treaty and the Treaty of 1842 Treaty fully cover the scenario that plaintiffs have presented here[,]" Doc. No. 84 at 23, the United States respectfully objects to that conclusion and Sections III(D) and (E) of the Report and Recommendation. Plaintiffs have failed to "present[] a scenario that places them under the protection of the treaties that they have invoked[,]" *id.* at 19, so summary judgment should be granted to the United States.

Initially, the United States objects to Section III(D) of the Report and Recommendation to the extent that it finds that the Canandaigua Treaty and the 1842 Treaty confer or preserve a

tax exemption, or provide a cause of action for individual members of the constituent nations of the Iroquois Confederacy like Alice Perkins.  Although the Court previously found that Plaintiffs plausibly stated a claim for relief under the Canandaigua Treaty and the 1842 Treaty sufficient to permit fact discovery, that preliminary ruling was not a final determination on the merits that is entitled to collateral estoppel effect.  *See, e.g.,* Doc. No. 84 at 19 ("Although Judge Vilardo has decided that the Canandaigua Treaty and the 1842 Treaties potentially recognize plaintiffs' claims, he made his decision in the context of Rule 12"); *see also Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007) (quoting *Fernandez v. Chertoff*, 417 F.3d 45, 51 (2d Cir. 2006)) ("[i]n considering such a motion to dismiss, 'the appropriate inquiry is not whether a plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims'").  The Tax Court's March 1, 2018 order on summary judgment, on the other hand, is a final adjudication on the merits of an identical dispute between the parties that may be applied as estoppel because it "was not avowedly tentative."  *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961); *see also, e.g., Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 754 (S.D.N.Y. 1990).

In any case – whether or not the treaties confer any tax exemption – Section III(E) of the Report and Recommendation is erroneous because the undisputed facts establish that the gravel-related income of A & F Trucking did not directly derive from Plaintiffs' land.  Plaintiffs did not own the surface or subsurface land from which they mined the gravel sold by A & F Trucking in 2010.[4]  *See* Doc. No. 72-1 at ¶¶ 8-12.  About one-fifth of A & F Trucking's receipts for 2010

---

[4] The United States objects to the background section of the Report and Recommendation to the extent that it did not identify as a matter of undisputed fact that the gravel products sold by
(continued...)

stemmed from the sale of stockpiled gravel products mined from a pit located within non-residential land owned by Janice Crowe.  *Id.* at ¶¶ 8-12, 23, 27, 66-67.  The subsurface of Janice Crowe's land was the "sole and exclusive property" of the Seneca Nation of Indians.  *Id.* at ¶ 9.  Plaintiffs were allowed to mine, manufacture, and sell gravel products only pursuant to a permit, and in exchange for royalties paid to the Seneca Nation and Crowe.[5]  *Id.* at ¶¶ 28-31, 33-35.  And their connection to the Jimerson Pit was attenuated.

It is well-settled that an income tax exemption must be based on an express provision in a statute or a treaty, since tax exemptions do not arise by implication.  *See Mescalaro Apache Tribe v. Jones*, 411 U.S. 145, 156 (1973).  Because no other court has found the specific treaty-based tax exemptions sought here, no other court has set forth a test for determining whether income has "derived directly from the land" in order to be exempted from taxation under the "free use and enjoyment" clause of the Canandaigua Treaty or Article IX of the 1842 Treaty.

The United States Magistrate Judge was guided by "similar or analogous" cases considering whether income was derived directly from Indian land under the General Allotment Act and related treaties.  *See* Doc. No. 84 at 19-23.  Cases interpreting the GAA generally have

---

(… continued)
Plaintiffs' derived from a pit that was owned by Janice Crowe, and that the gravel itself was the sole and exclusive property of the Seneca Nation.

[5] The United States objects to the findings in the background section that (1) Alice Perkins decided to begin mining gravel when she became aware of a state highway reconstruction project; and (2) Plaintiffs finished selling the stockpiled sand and gravel products from the Jimerson Pit in 2010.  *See* Doc. No. 84 at 3.  Neither finding is accurate.  *See* Doc. No. 60-2 at ¶ 21 ("Alice J. Perkins initially agreed for A & F Trucking to mine gravel from the Jimerson Pit in order to supply A & F Trucking with gravel for its own construction projects such as installing septic systems and fixing driveways"); Doc. No. 60-5 at 25 ("Q: Did you eventually exhaust the supply of sand and gravel that had been stockpiled?  A: No. There is still sand down there.")

found as tax exempt income directly derived from an allottee's logging, farming, ranching, oil and gas leases, and royalties from mineral deposits. *See* Doc. No. 84 at 19-23; *see also, e.g., Hale v. United States*, 579 F. Supp. 646. 647-48 (D. Minn. 1984). "To be directly derived from the land, income must be from the exploitation of the land itself by mining, logging, agriculture or similar activity, not just the land's location." *Matter of Cabazon Indian Casino v. Internal Revenue Serv.*, 57 B.R. 398, 403 (9th Cir. BAP 1986). Therefore, income *indirectly* derived from an allottee's land – for operating businesses on tribal land, the sale of goods produced off the reservation, and similar activities – is not tax exempt under the GAA. Doc. No. 84 at 19-21. The Report and Recommendation interpreted these cases to compel that, since the "origin of the gravel" was land that belongs to the Seneca Nation, Plaintiffs' income also derived directly from Indian land. *Id.* at 21. Essentially, the Report found that because the gravel derived directly from Seneca land, Plaintiffs' income necessarily derived directly from the land. That analysis and conclusion is incorrect.

"The [GAA's] tax exemption for income derived directly from the land has been construed rather narrowly by the courts." *Matter of Cabazon Indian Casino*, 57 B.R. at 403. In *Squire v. Capoeman*, the Supreme Court recognized a limited tax exemption under the GAA for income directly derived from allotted trust land. *Squire v. Capoeman*, 351 U.S. 1, 10 (1956). The GAA is a treaty between the United States and specific tribes (not including the Seneca Nation), through which the Government promised to transfer allotted trust land to individual members "free of all charge or incumbrance whatsoever." *Perkins*, 2018 WL 1146343, at 3. The Supreme Court found that the GAA explicitly conferred a tax exemption to individual allottees in order to "preserve the trust and the income derived therefrom[.]" *Id*. at 8-9. That is, trust property is not "free of all charge or incumbrance whatsoever" under the GAA if a tax is

9

applied to income derived directly from an allottee's land. *Id*. "The essential basis of *Capoeman* is the protection of the property right of the allottee during the trust period." *Hale*, 579 F. Supp. 648.

However, the tax exemption recognized under the GAA and similar treaties has been limited to income earned by individual owners of Indian allotments. It has not been recognized where, as here, personal income derived from tribe-owned reservation lands. Instead, an unbroken line of cases has rejected claims of tax exemption for a lessee or permit holder's income directly derived from land owned by a tribe or other Native Americans. Those courts have uniformly held that, "taxation of the taxpayer's individual profit derived from his lease of tribal (or other allottees' trust) land cannot possibly represent a burden or encumbrance upon the tribe's (or other allottees') interest in such land." *Holt v. Commissioner*, 364 F.2d 38, 41 (8th Cir. 1966); *see also Wynecoop v. Commissioner*, 76 T.C. 101, 107 (Tax 1981) ("taxation of a noncompetent Indian's individual profit derived from the lease of tribal or allotted land does not represent a charge or encumbrance upon the tribe's or allottee's ownership interest in such land within the meaning of *Squire*"). For example, income derived by an Indian licensee ranching on common tribal land is not tax exempt, even if an allottee's income directly derived from ranching is exempt from tax under the GAA. *United States v. Anderson*, 625 F.2d 910, 914 (9th Cir. 1980); *see also Holt,* 364 F.2d at 41. Similarly, income derived by a Native American from logging operations on unallotted tribal land is not tax exempt. *Fry v. United States*, 557 F.2d 646, 648 (9th Cir. 1977); *see also Red Lake Band of Chippewa Indians v. United States*, 861 F. Supp. 841, 845 (D. Minn. 1994). Income derived from an enrolled member's mineral lease on tribal lands also is not tax exempt. *Wynecoop v. Commissioner*, 76 T.C. 101, 104 (Tax 1981).

The Report and Recommendation therefore errs when it concentrates on the "origin of the gravel" and ignores Plaintiffs' lack of property interest in the subsurface or surface land from which gravel was mined.  Doc. No. 84 at 21.  Finding that Plaintiffs' gravel income was tax exempt "ignores the word 'directly' in the 'directly derived' test."  *Hale*, 579 F. Supp. at 648; *see also Jourdain*, 617 F.2d at 508 (rejecting appellant's claim that his tribal council salary was tax exempt because it was paid from the proceeds of royalties and leases of resources directly derived from the land).  Here, the undisputed evidence shows that Plaintiffs are not allottees, so their gravel income derived *indirectly* from the land, even if the gravel itself was directly derived from the land.

Plaintiffs' gravel income also did not derive directly from the land when considering the factors that the United States Magistrate Judge and this Court identified in denying the United States' motion to dismiss.  *See* Doc. No. 14 at 12-13 & Doc. No. 24 at 6-10.  Under that analysis, Plaintiffs were required to establish that the tax on their 2010 gravel income violated the Canandaigua Treaty due to "a fairly modest amount of income . . . [having come] so directly from Seneca land that, in a sense, they were selling a part of the physical land itself," Doc. No. 14 at 12; or that the tax violated the 1842 Treaty because it constitutes a tax on real property.  Doc. No. 24 at 10.  As discussed at length in the United States' motion for summary judgment, the undisputed facts show that Plaintiffs' gravel income did not directly derive from the land.  *See* Doc. No. 60-1 at 32-38.  Plaintiffs' profits did not accrue due to their ownership of surface land on the Allegany Territory – the owner was Janice Crowe.  And Plaintiffs did not earn royalties because they owned the bank gravel from which the boulders, crushed stone, crushed gravel, and backfill originated – the owner was the Seneca Nation itself.  Moreover, Plaintiffs did not directly profit from working at the Jimerson Pit – almost all labor was expended by their

11

employee, Greg Vanderweghe.  In actual fact, Plaintiffs' business, A & F Trucking, was not directly selling "the land," but instead earned income from selling a stockpile of manufactured products that resulted after it had separated, crushed, screened, and washed the bank materials using large machines.

The Report and Recommendation erroneously rejects these arguments, concluding that "[o]nly a harsh and limiting stereotype would require plaintiffs to extract gravel as they would have in 1794 or 1842, to avail themselves of a tax exemption."  Doc. No. 84 at 23.  The United States respectfully submits that interpreting the plain terms of the two treaties – as understood by the Seneca signatories – does not require any stereotypes.  It is well-settled that tax exemptions are strictly construed, and require express statutory language.  *Id.* at 16-18.  "No exemption may be found in a treaty's silence."  *Red Lake Band*, 861 F. Supp. at 845.  Treaties with Native American nations also are construed "in the sense in which they would naturally be understood by the Indians."  *Jones v. Meehan*, 175 U.S. 1, 11 (1899).  Accordingly, courts considering whether certain income is exempt from taxation under statute or treaty often analyze the contemporaneous understanding of the tribal signatories.  Doc. No. 84 at 18 (citing *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943)).  "But even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties."  *Id.*  A court is empowered to consider the meaning the Seneca Nation ascribed to "free use and enjoyment of the land" in 1794 and "protect such of the lands … from all taxes, and assessments for roads, highways or any other purpose" in 1842, but a court may not *sua sponte* create favorable rules.  *See Fry*, 557 F.2d at 649.

The Report and Recommendation observes that "the signatories to the treaties in question likely would have had little concept of 'free use and enjoyment of land' beyond subsistence

living or other personal uses." Doc. No. 84 at 21.  Indeed, other courts have construed similar treaty language as protecting only "the rights of Indians to hunt and otherwise enjoy their land, not the 'right' to be free from federal taxation." *Jourdain*, 617 F.2d at 509.  The canons of liberal treaty interpretation compel that if the signatories understood "free use and enjoyment of the land" only to include subsistence farming or other personal uses, that is the extent of the promises made in the Canandaigua Treaty and the 1842 Treaty.

The Court previously held that the "free use and enjoyment" clause of the Canandaigua Treaty and Article IX of the 1842 Treaty plausibly confer a tax exemption to income directly derived from Seneca land.  *See* Doc. No. 24 at 6-7.  But the undisputed facts in this case show that Plaintiffs' income was *indirectly* derived from Seneca land.  Plaintiffs did not own the surface or subsurface of the Jimerson Pit, they did not personally mine or sell the gravel, and the stockpiled gravel products sold by A & F Trucking resulted from an extensive manufacturing process.  Accordingly, Plaintiffs are not entitled to any treaty-based tax exemption that applies to income directly derived from the land.

## Motion to Strike

The United States objects to the Report and Recommendation to the extent that it urges denial of the Motion to Strike.  The Report and Recommendation would permit the Court to consider inadmissible evidence, and therefore Section III(A) is erroneous.

Initially, the Report fails to apply Federal Rule of Civil Procedure 37(c), which entirely prohibits the affidavit testimony of John Pawlak because he was never identified as a witness in Plaintiffs' Rule 26 disclosures.  *See* FED. R. CIV. P. 37(c)(1).  Although Pawlak plainly is intended as an expert witness, Rule 37(c) bars his testimony whether he is considered a fact witness, summary witness, or expert witness.  *See id.*; *see also* Doc. No. 75 at 4 (quoting *Enters*

*v. AT&T*, 2005 WL 3988698, at *2 (D.N.J. Sept. 8, 2005)) ("This Court is unaware of any law exempting 'summary witnesses' from Rule 26's requirements, and plaintiffs have not identified any. This is not surprising, as Rule 37(c) precludes a party from using 'any witness' not disclosed pursuant to Rule 26[.]")

Moreover, the Pawlak affidavit was not "made on personal knowledge." FED. R. CIV. P. 56(c)(4). Plaintiffs admit as much, but contend that he is a "summary witness." Doc. No. 74-2 at 14-15. However, the Pawlak affidavit does not summarize evidence too voluminous to be conveniently examined in court. *See* FED. R. EVID. 1006. It instead interprets Plaintiffs' records and receipts, analyzes the tax consequences of Plaintiffs' asserted income and business expenses, and provides a conclusion on the ultimate issue in this lawsuit – whether Plaintiffs are entitled to a tax refund for 2010. *See* Doc. No. 61-4 at ¶¶ 4, 8, 11, 15, & 18 (submitting calculations, "SWC Findings," and conclusions). The Pawlak affidavit summarizes accountant John Pawlak's expert findings on whether Plaintiffs are entitled to a refund for tax year 2010, which are presented in the form of an unfiled Schedule C to a Form 1040 individual tax return (attached as Exhibits A, B, and C to the Pawlak affidavit). The Pawlak affidavit does not simply summarize the voluminous underlying documents – which actually are attached to Alice Perkins's affidavit – it provides an opinion on the primary issue in this litigation. Accordingly, it cannot be admitted as a summary exhibit. *See, e.g., United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (a summary witness cannot tell the jury "what [is] in the evidence" or "what inferences to draw from it"); *see also Ferrari Club of Amer. v. Bourdage*, 2017 WL 1498080, at *7-*8 (W.D.N.Y. Apr. 25, 2017) (emphasis in original) (a summary witness's "*interpretation* of the evidence he summarizes is not permitted before the jury").

The Report and Recommendation also errs by urging consideration of the numerous unauthenticated documents submitted in support of Plaintiffs' motion for summary judgment. Those purported business records are inadmissible as hearsay because they are not supported by the trial testimony of a custodian or a written certification that complies with Rule 902 of the Federal Rules of Evidence. *See Moran v. Livingston*, 155 F. Supp. 3d 278, 285 (W.D.N.Y. 2016); *see also* Doc. No. 84 at 14 (observing that the records presented by Plaintiffs currently are inadmissible without "additional context or testimony").

The Second Circuit repeatedly has held that motions for summary judgment must be supported by admissible evidence. *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008); *see also Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997) ("The principles governing admissibility of evidence do not change on a motion for summary judgment").  The Western District of New York and other courts within the Second Circuit demand a proper written certification before considering business records submitted in support of a motion for summary judgment.  *See, e.g., Moran*, 155 F. Supp. 3d at 285; *Cusamano v. Carlsen*, 2011 WL 7629512, at *7 (N.D.N.Y. Dec. 16, 2011), *rec. adopted*, 2012 WL 1036854, at *4 & *7 n.19 (N.D.N.Y. Mar. 27, 2012); *Tradax Energy, Inc. v. Cedar Petrochem., Inc.*, 317 F. Supp. 2d 373, 378-79 (S.D.N.Y. 2004).  Without the required Federal Rule of Evidence 902 certification, Plaintiffs' "records are not properly part of the record before this Court on the summary judgment motion." *Moran*, 155 F. Supp. 3d at 285.

However, the Report and Recommendation urges that those records may be considered because there is "some reasonable probability that the materials can be cleaned up at trial to remove any evidentiary infirmities." Doc. No. 84 at 13. That finding is erroneous. *Celotex Corp. v. Catrett* and the other cases cited in the Report and Recommendation only stand for the

15

proposition that "Rule 56(e) permits a proper summary judgment motion to be *opposed* by any of the kinds of evidentiary materials listed in Rule 56(c)[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (emphasis added). That is, a party may show that material facts are disputed – and avoid summary judgment – by referring to evidence that can be presented in an admissible form at trial. *See, e.g., Gordon v. Kaleida Health*, 299 F.R.D. 380, 393 (W.D.N.Y. 2014). Here, Plaintiffs submitted all 1,400 pages of purported business records in *support* of their motion for summary judgment. They did not submit those statements, receipts, and summaries to show a genuine dispute as to a material fact, but instead to establish that there are no issues of material fact. If the Court relies upon that still-hearsay evidence as Plaintiffs intended – to grant their motion for summary judgment – there will be no trial at which the evidentiary infirmities might be remedied.

The recommendation denying the United States' Motion to Strike, which would permit consideration of those inadmissible documents in support of Plaintiffs' motion, therefore is erroneous.

**Conclusion**

The undisputed facts before the Court establish that Plaintiffs are not due a refund because their taxable income in 2010 exceeded their deductible business expenses – no matter whether their gravel-related income was taxable. Plaintiffs are barred from relying on newly-asserted bases for refund that were not raised in their administrative claim. For that reason alone, summary judgment is appropriate and Section III(F) of the Report and Recommendation is erroneous.

Moreover, the undisputed summary judgment evidence shows that Plaintiffs' gravel-related income did not derive directly from the Seneca land. Under cases interpreting the GAA

and similar treaties, Plaintiffs' income did not "directly" derive from the land, because the Jimerson Pit and its subsurface were not allotted to, owned, or occupied by Plaintiffs. The gravel was "the sole and exclusive property of the Nation." Moreover, the record shows that Plaintiffs' income was not so directly tied to the Allegany Territory that federal income tax burdened their "free use and enjoyment" of the land or constituted a tax on that land. Accordingly, summary judgment is appropriate, and Sections III(D) and (E) of the Report and Recommendation are erroneous.

Finally, the Pawlak affidavit is prohibited by Rules 37(c) and 56(c)(4) of the Federal Rules of Civil Procedure, since John Pawlak was never identified as a witness, and his affidavit was not made on personal knowledge. The 1,400 pages of unauthenticated documents purporting to be business records currently are in inadmissible form, and also cannot be considered in support of Plaintiffs' motion for summary judgment. Therefore, Section III(A) of the Report and Recommendation is erroneous, the United States' motion to strike should be granted.

For the reasons set forth above, and those raised in support of the United States' motion for summary judgment, the Court should grant summary judgment and dismiss this lawsuit.

    Respectfully Submitted,

    RICHARD E. ZUCKERMAN
    Principal Deputy Assistant Attorney General

    *s/ Jordan A. Konig*
    JORDAN A. KONIG
    Trial Attorney, Tax Division
    U.S. Department of Justice
    Post Office Box 55, Ben Franklin Station
    Washington, D.C. 20044
    Phone: (202) 305-7917/Fax: (202) 514-5238
    Email: Jordan.A.Konig@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that service of the foregoing *Objection to the Report and Recommendation of the United States Magistrate Judge*, has this 7th day of August, 2018, been made via electronic notification through the Court's CM/ECF electronic filing system, to all parties who have entered an appearance in this action and are participating in the Court's CM/ECF electronic filing system.

*s/ Jordan A. Konig*
JORDAN A. KONIG
Trial Attorney, Tax Division
U.S. Department of Justice